FILED: June 3, 2011

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4760**
**(1:08-cr-00086-WDQ-9)**

UNITED STATES OF AMERICA,

　　　　　Plaintiff - Appellee,

　　　v.

ALLEN SMITH, a/k/a Poe,

　　　　　Defendant - Appellant.

O R D E R

　　　The Court amends its opinion filed May 17, 2011, as follows:

　　　On page 15, first full paragraph, line 14, the word "reversing" is changed to "affirming," and on line 15, the word "denial" is changed to "grant."

　　　　　　　　　　For the Court – By Direction

　　　　　　　　　　/s/ Patricia S. Connor

　　　　　　　　　　Clerk

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 09-4760
(1:08-cr-00086-WDQ-9)

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ALLEN SMITH, a/k/a Poe,

Defendant - Appellant.

O R D E R

The Court amends its opinion filed May 17, 2011, as follows:

On page 18, second full paragraph, lines 4-6 -- the word "at" is inserted after "838 F. 2d" and before "108"; a space is added between "F." and "Supp." and between "Supp." and "2d"; and the second "___," after "F. Supp. 2d" is deleted.

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ALLEN SMITH, a/k/a Poe,

*Defendant-Appellant.*

No. 09-4760

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William D. Quarles, Jr., District Judge.
(1:08-cr-00086-WDQ-9)

Argued: January 25, 2011

Decided: May 17, 2011

Before KING, AGEE, and DAVIS, Circuit Judges.

Affirmed by published opinion. Judge Davis wrote the majority opinion, in which Judge King concurred, and in which Judge Agee concurred except as to Part II.B. Judge Agee wrote a separate opinion concurring in part and concurring in the judgment.

## COUNSEL

**ARGUED:** Sicilia Englert, LAWLOR & ENGLERT, LLC, Greenbelt, Maryland, for Appellant. Christopher M. Mason,

OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

## OPINION

DAVIS, Circuit Judge:

In this appeal from a 151-month sentence based on Appellant Allen Smith's guilty plea, we explore the interrelationship of the Fifth Amendment due process requirement that a guilty plea be voluntary and the Sixth Amendment guarantee that an accused enjoy "the Assistance of Counsel."

During the proceedings below, Smith advised the district court that his relationship with counsel was irretrievably fractured and requested on several occasions that the district court appoint substitute counsel. The district court refused Smith's requests, peremptorily advising him, before fully exploring the reasons for the disharmony between Smith and his counsel, that he had "been appointed one lawyer, and one lawyer is your free limit."

Eventually, Smith entered into a plea agreement with the Government and pled guilty; the guilty plea hearing complied unerringly with the formalities dictated by Federal Rule of Criminal Procedure 11. Nevertheless, by the time of the ensuing sentencing hearing, disputes between Smith and his appointed counsel had reemerged, and Smith again asked the district court to appoint substitute counsel. The district court refused.

Before us on appeal (now represented by substitute appointed counsel) Smith argues that his guilty plea was rendered involuntary by the court's refusal of his request for sub-

stitute trial counsel and that, at sentencing, the court likewise erred when it denied his renewed request for substitution. We have carefully considered Smith's contentions and we conclude that, viewing all that transpired below, he has not made a substantial showing that his guilty plea was involuntary. This conclusion is based on our determination that the district court's refusal to appoint substitute counsel did not, under the circumstances, deprive Smith of the meaningful assistance of counsel.

Similarly, we conclude that the district court's subsequent refusal to grant Smith's request for substitution of counsel for purposes of the sentencing hearing did not violate Smith's rights, in light of all that had gone before its refusal and the circumstances of the sentencing hearing itself. Accordingly, we affirm the judgment of the district court.

## I.

### A.

Smith was charged on February 21, 2008 in a twenty-count indictment naming twenty-eight defendants with conspiracy to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(d), and conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846. He was alleged to be a member of Tree Top Pirus, a subset of the Bloods gang.

The district court appointed a distinguished member of the federal trial bar to represent Smith on March 24, 2008. The court ordered Smith detained pending trial and, in light of the number of defendants joined in the indictment, it scheduled separate groupings of defendants for separate trials. Smith was in the group assigned a trial date of July 6, 2009.

In February and March 2009, Smith wrote three letters to the district court complaining about his trial counsel's repre-

sentation. Counsel had accepted the terms of the Government's discovery agreement (a customary practice among the defense bar in the district), which precluded him from making copies of the discovery materials for Smith to retain; however, counsel and Smith could review the materials at the detention facility where Smith was being held. Smith objected to this arrangement and expressed concerns in his first letters to the district court about potential collusion between his trial counsel and the prosecution. In his final letter, dated March 30, 2009, Smith informed the court that his counsel "was not very happy" about Smith's prior correspondence with the court and had told Smith to "contact [the court] and ask that another lawyer be appointed." J.A. 59. Smith asked that the court "possibly consider appointment of alternate counsel," worried that counsel was "so mad . . . my defense will be sabotaged." *Id.*

Despite Smith's evident dissatisfaction with his counsel, the latter was actively engaged in plea negotiations with the Government on Smith's behalf before and after March 30, 2009. At some point during this period, the district court scheduled Smith's rearraignment for April 23, 2009. The Government believed, based on its negotiations with Smith's counsel, that Smith would enter a guilty plea pursuant to Federal Rule of Criminal Procedure 11, pleading guilty to conspiracy to participate in a racketeering enterprise (Count One of the indictment) in conformity with a written plea offer dated April 3, 2009.

Instead, when court convened on April 23, 2009, Smith immediately asked to address the court. He told the court that he could not "go about signing this plea [agreement]" with trial counsel "not really representing me." J.A. 61. He reported that counsel had "called [him] an asshole for me asking him a question" when they met just before the hearing, and he reiterated what he had expressed in his earlier letters to the court: that he was "not happy with my representation." *Id.* The district court told Smith "one lawyer is your free

limit" and specifically instructed him that his "choices in this matter" were three: "Learn to work with [appointed trial counsel], hire a lawyer, or represent yourself." J.A. 62.

The district judge then entered into a detailed discussion with Smith about his complaints. When Smith asserted that he had been "ask[ing] [counsel] to do certain things to help me in this case, and he's not doing it," the court inquired further. J.A. 63. Smith pointed to a petition for a writ of *coram nobis* that he wished counsel to file for him in order to challenge certain prior state court convictions, and counsel explained that he was investigating the factual predicates for such a petition.[1] The court decided to postpone the guilty plea proceedings to allow counsel to pursue *coram nobis* relief and to permit Smith to consider hiring alternate counsel.

The Rule 11 hearing resumed thirteen days later on May 6, 2009. At that point, according to counsel's statements at the hearing summarizing his course of dealing with Smith over the period of his representation, he had met with Smith at the Allegany County Detention Center [located approximately 150 miles from Baltimore] "four or five times . . . and [had] conferred with the defendant [in Baltimore]." J.A. 89-90. Earlier that day, Smith and counsel had signed the plea agreement the Government had offered on April 3. Smith signed both the plea agreement and the separate factual stipulation under the following statement: "I am completely satisfied with the representation of my attorney." J.A. 77, 84.

During the plea colloquy (which complied entirely with the dictates of Rule 11), after Smith had been placed under oath,

---

[1]The effect of Smith's three prior state-court drug distribution convictions was to render Smith a "career offender" under § 4B1.1 of the advisory Sentencing Guidelines, nearly doubling his offense category from offense level 16 (after acceptance of responsibility credit) to 29 (same). Thus, Smith was anxious to challenge those convictions, all of which occurred in 2002.

the court asked Smith about counsel's representation, telling him, "If you've got a problem, you've got to [let me] know about it now." J.A. 91. Smith replied that counsel was "all right" and that he, Smith, was "all good with it." *Id.* Yet Smith was less than enthusiastic in his endorsement of counsel: when the court asked if Smith was "currently satisfied with his services," Smith replied, "*I have no choice but to be, Your Honor. I'm keeping it honest, Your Honor.*" J.A. 92 (emphasis supplied). As Smith had explained moments before, "I mean we had our ups and downs, but I'm here to go through with it today." J.A. 91. When asked by the district court if they had "worked out those ups and downs," Smith replied, "Yes." *Id.*

The court also asked Smith why he was pleading guilty. Smith initially said he was pleading "so I won't have to get life" and maintained that he was "n[o]t guilty," but he immediately recanted and stated he was "pleading guilty because I'm guilty." J.A. 103-04. The court asked, "Well, which is it?" and Smith repeated, "I'm guilty." J.A. 104. Before the conclusion of the proceeding, the district court accepted Smith's guilty plea.

Just before the hearing concluded, counsel volunteered to the court that, despite "some disagreement and dissatisfaction on both sides earlier," he thought that he and Smith were "now back on track" and that Smith was "satisfied that I'm doing everything that I can for him." J.A. 104-05.

B.

Smith's sentencing hearing was held on August 14, 2009. The hearing opened with a reference by defense counsel to an eighteen-page document he had forwarded to the district judge's chambers, a "Memorandum in Aid of Sentencing," which Smith had prepared with the assistance of a friend, not counsel. Smith then spoke about his continuing problems with counsel:

[L]ast time I was here, if you notice, me and [counsel], we ain't getting along, and it's still continuing . . . . I feel as though [counsel] ain't got my best interests in representing me, and he just told me downstairs that he would let you know yourself [sic] that he's withdrawing from being my counsel.

J.A. 110. The court asked about the status of the *coram nobis* petition, and counsel explained that his research indicated that Smith had waived his right to seek *coram nobis* relief by failing to timely apply for leave to appeal the prior convictions (each based on Smith's guilty pleas) as required under state law. Counsel then detailed his last face-to-face meeting with Smith.

The two met on June 24, 2009, to discuss the presentence investigation report (PSR), but the conversation quickly turned to the *coram nobis* petition. Counsel stated that Smith then became "belligerent" and correctional officers interceded, ending the meeting. J.A. 111. Counsel sent the Probation Office a letter regarding the exceptions Smith had raised about the portions of the PSR that were discussed before the meeting ended; he had copied Smith on the letter and told Smith to review the remainder of the report and to inform the Probation Office directly of any further exceptions. Counsel told the court that he had not conducted any further review of the PSR with Smith and that Smith was planning to again ask for the appointment of substitute counsel. In that context, counsel wished to "say to the Court that I do believe that our relationship, such as it has ever been, has obviously broken down to the point where we are not able to sit down and have a rational, reasonable discussion about this case and about the issues in this case." J.A. 113.

After counsel apprised the court of the situation, Smith did, in fact, again request substitute counsel, and the court again told Smith his only choices were to hire an attorney, to proceed with the same appointed counsel, or to represent himself.

Smith explained that he was unable to retain private counsel and incapable of representing himself, and no more was said about Smith's representation.

The court asked Smith about the PSR; Smith told the court that he had read the report and that "the only . . . objection that I ever had to it" was that it failed to consolidate certain prior convictions. He also corrected a sentence that mistakenly reported that he had requested placement in a mental health program, when he had instead asked for a drug treatment program. J.A. 119-20. Just before the sentencing hearing, Smith had given counsel a letter confirming Smith's participation in the "Creating Lasting Family Connections Program" at the Allegany County Detention Center and a certificate of completion from a "men's issues group," also at the Detention Center, both of which counsel presented to the court. J.A. 123.

Smith said a few words about "asking for another chance," being "a father to my kids," and explained that he "really ha[d]n't d[one]" anything, he had just been "around . . . the wrong crowd." J.A. 124. The court then sentenced Smith to 151 months of incarceration, the bottom of the applicable advisory Sentencing Guidelines offense range, noting that twelve and a half years was appropriate given that, among other things, Smith had suffered multiple gunshots on two distinct occasions and still had not been dissuaded from a life of drug crime.

Smith brought a timely appeal challenging both his guilty plea and his sentence. Though the plea agreement stated that Smith would waive the right to appeal any sentence at the bottom of the applicable Guidelines range, the Government has elected not to enforce that provision. *Cf. United States v. Attar*, 38 F.3d 727, 732-33 (4th Cir. 1994) (noting general appeal waiver did not waive defendant's right to appeal his sentence on the ground that the proceedings following the entry of his guilty plea were conducted in violation of his

Sixth Amendment right to counsel). After filing a notice of appeal on behalf of Smith (as specifically instructed by the district court), counsel moved to withdraw as appellate counsel. We granted counsel's motion and appointed substitute counsel.

## II.

On appeal Smith alleges that his guilty plea was involuntary because the district court erroneously denied his requests for substitute counsel, an error that left him bereft of the assistance of counsel at the time of plea negotiations and of his actual guilty plea. Separately, he argues that, as a result of the district court's erroneous denial of his renewed request at the sentencing hearing, he was likewise effectively denied the assistance of counsel at sentencing. We conclude for the reasons set forth within that Smith's contentions do not entitle him to relief.

## A.

Before reaching the merits of Smith's involuntariness claim, we first address the issue of wavier, which is urged on us by the Government. The Government argues that, because Smith never objected to the Rule 11 colloquy or moved to strike his guilty plea, we may review the voluntariness of his plea only for plain error. Br. of Appellee, at 42. But here Smith claims that his guilty plea was involuntary because he was denied his Sixth Amendment right to the assistance of counsel (not owing to some defect in the actual Rule 11 proceeding). Smith raised this substitution issue multiple times with the district court, first in letters prior to his rearraignment and then twice orally in the course of the subsequent hearings. Though of course he did not challenge the guilty plea itself on this ground—his claim is precisely that he lacked the sort of lawyerly advice that would have advised him to do so—he *did* inform the court, at the first opportunity in open court, i.e., at the original Rule 11 hearing on April 23, 2009, that he felt it

would be inappropriate to sign the plea agreement without meaningful representation. *See* J.A. 61 ("[H]ow can I go about signing this plea [with counsel] not really representing me.").

The Federal Rules of Criminal Procedure provide that a party preserves a claim when it "inform[s] the court—when the court ruling or order is made or sought—of the act the party wishes the court to take," and the Rules specifically provide that "[i]f a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party." Fed. R. Crim. P. 51(b). *See also United States v. Hanno*, 21 F.3d 42, 45 n.2 (4th Cir. 1994) (reading Rule 51 to require a "meaningful opportunity to make a contemporaneous objection"); *cf. United States v. Vonner*, 516 F.3d 382, 385 (6th Cir. 2008) (requiring a "meaningful opportunity").

The Government suggests that Smith could only have preserved the issue by moving in the district court to withdraw his guilty plea, but requiring such a later motion in the circumstances of this case "would exceed the error-preservation requirements of Rule 51(b), which has been characterized as a 'contemporaneous-objection rule.'" *United States v. Burrell*, 622 F.3d 961, 966 (8th Cir. 2010) (quoting *Puckett v. United States*, ___ U.S. ___, 129 S. Ct. 1423, 1429 (2009)). As the Eighth Circuit noted, "[t]he 'opportunity to object' language would be meaningless if the mere ability to file a motion for reconsideration qualified as an opportunity to object." *Id.* Where Smith raised the underlying issue repeatedly with the court, specifically attempting to "protect [his] rights and place the issue on the record for future use if necessary," S.J.A. 4, he has not waived the issue of the voluntariness of his guilty plea by failing to renew the objection as he entered that plea. *Cf. McMann v. Richardson*, 397 U.S. 759, 767 & n.12 (1970)

(recognizing that the "guilty plea is properly open to challenge" where defendant was "uncounseled"). [2]

Of course, Sixth Amendment right-to-counsel claims are most often brought in petitions for post-conviction relief. Our precedents make it clear, however, that we will consider even ineffectiveness claims—the most fact-intensive of the bunch—when they are not waived and when we need not look beyond the trial court record brought before us in a direct appeal. *United States v. Baldovinos*, 434 F.3d 233, 239 (4th Cir. 2006); *United States v. Russell*, 221 F.3d 615, 619 (4th Cir. 2000); *cf. United States v. Cronic*, 466 U.S. 648, 667 n.42 (1984). In this case, the factual basis for Smith's particularized Sixth Amendment claim lies completely within the record before us and the claim has been preserved (as the district court seemingly acknowledged, in that it instructed counsel to file a notice of appeal on Smith's behalf, notwithstanding the appeal waiver in the plea agreement it had accepted). Accordingly, Smith's claim is appropriately before us on direct appeal and "plain error" review of his involuntariness claim does not apply.

## B.

Because Smith contends that the district court's erroneous denial of his substitution request rendered his plea involuntary, there remains some uncertainty as to the proper standard of review. Although we have said that we review a lower court's ruling on a motion to substitute counsel for "abuse of discretion," *see United States v. Reevey*, 364 F.3d 151, 156

---

[2]To paraphrase what we said in *United States v. Manigan*, 592 F.3d 621, 627 (4th Cir. 2010):

> When a district court has advised a defendant that . . . he is entitled to [only one free lawyer] . . . the defendant can hardly be said to have knowingly waived his" claim of error as to the district court's denial of his request for a substitution of counsel upon entering a guilty plea.

(4th Cir. 2004), "[t]ypically, we review the voluntariness of a guilty plea de novo," *United States v. General*, 278 F.3d 389, 393 (4th Cir. 2002), "considering all of the relevant circumstances surrounding it." *Brady v. United States*, 397 U.S. 742, 749 (1970). The Government argues in this case that we should proceed under an abuse of discretion standard, [3] while Smith simply cites both standards of review and chooses not to wade any further into the murky water. To select the proper standard of review, we must first untangle the relationship between the alleged involuntariness of Smith's guilty plea and the underlying denial of his request for the appointment of substitute counsel. This task requires that we first identify the source of the right to substitute counsel.

1.

We have sometimes suggested that a defendant's Sixth Amendment right to be appointed substitute counsel is to be derived from the right to "be afforded a reasonable opportunity to secure counsel of his own choosing." *United States v. Gallop*, 838 F.2d 105, 107 (4th Cir. 1988). But later choice-of-counsel cases have indicated that "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). Rather, as the limitations we have

---

[3]The Government also urges that a guilty plea accepted after a Rule 11 colloquy is ordinarily conclusive, but this presumption does not obtain when voluntariness is attacked based on the constructive denial of counsel. As we explained in *Via v. Superintendent*, attacks on a guilty plea are "not invariably[ ] foreclosed." 643 F.2d 167, 171 (4th Cir. 1981). The presumption that "statements at arraignment that facially demonstrate the validity of his plea are conclusive" applies "*unless* [the appellant] presents reasons why this should not be so," such as a claim that "the advice [the defendant] received from counsel" was deficient. *Id.* (emphasis added). *A fortiori*, a claim of constructive denial of counsel is not barred by such a presumption, either. *See also infra* pp. 18-22 (discussing, *inter alia*, *United States v. Moussaoui*, 591 F.3d 263 (4th Cir. 2010) (affirming conviction and sentence after guilty plea and rejecting claim that guilty plea was involuntary under Fifth and Sixth Amendments)).

placed on the right to substitution indicate, the right to appointment of substitute counsel must spring directly from the indigent defendant's right to counsel recognized in *Gideon v. Wainwright*, 372 U.S. 335 (1963).

Our review of denial-of-substitution claims has focused on three inquiries: (1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) "whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." *Gallop*, 838 F.2d at 108; *accord Reevey*, 364 F.3d at 156-57 (quoting *Gallop*). As to that last inquiry, "[a] total lack of communication is not required": "Rather an examination of whether the extent of the breakdown prevents the ability to conduct an adequate defense is the necessary inquiry." *United States v. Johnson*, 114 F.3d 435, 443 (4th Cir. 1997). Thus, we have been concerned not with the indigent defendant's freedom of choice or with whether the attorney and his client have a "meaningful relationship," *Morris v. Slappy*, 461 U.S. 1, 14 (1983), but with a "breakdown" of attorney-client communication so great that the principal purpose of the appointment—the mounting of an adequate defense incident to a fair trial—has been frustrated. In short, the defendant's Sixth Amendment right to successor appointed counsel arises because the initial appointment has ceased to constitute Sixth Amendment assistance of counsel. [4]

As Justice Sutherland famously explained in *Powell v. Alabama*,

---

[4] To warrant substitute counsel, a defendant must show justifiable dissatisfaction with appointed counsel . . . . Justifiable dissatisfaction sufficient to merit substitution of counsel includes a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant . . . .

*United States v. Swinney*, 970 F.2d 494, 499 (8th Cir.), *cert. denied*, 506 U.S. 1011 (1992), and *cert. denied*, 507 U.S. 1007 (1993) (internal quotations and citation omitted) (cited with approval in *United States v. Morsley*, 64 F.3d 907, 918 (4th Cir. 1995)).

> The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. . . . Even the intelligent and educated layman . . . lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him.

287 U.S. 45, 68-69 (1932). These poignant words make plain that only when a defendant is "heard *by* counsel" can a defendant be heard *through* counsel. The mere physical presence of competent counsel is not enough: it is the marriage of the attorney's legal knowledge and mature judgment with the defendant's factual knowledge that makes for an adequate defense. Indeed, the text of the Amendment makes this clear. The Sixth Amendment guarantees the provision not simply of *counsel*, but of "*the Assistance* of Counsel for [the accused's] defence." U.S. Const. amend. VI (emphasis added). *Cf. United States v. Cronic*, 466 U.S. 648, 654 (1984) ("If no *actual* 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated.") (emphasis added); *Gonzalez-Lopez*, 548 U.S. at 153 (Alito, J., dissenting) ("The Assistance of Counsel Clause focuses on what a defendant is entitled to receive ('Assistance'), rather than on the identity of the provider."). Where a defendant's communication with an appointed attorney has so frayed that a court determines the mounting of an adequate defense to be impossible, the defendant is neither "be[ing] heard by counsel" nor receiving "the Assistance of Counsel for his defence."

Though substitution and ineffectiveness claims are of course distinct, a line of ineffectiveness cases informs our understanding of the right to substitution. The Court recognized in *Cronic* that a per se Sixth Amendment violation may arise where, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without

inquiry into the actual conduct of the trial." *Id.* at 659-60. By the same token, when a breakdown in attorney-client communication is so severe that it "prevents" even "*the ability* to conduct an adequate defense," *Johnson,* 114 F.3d at 443 (emphasis added)—that is, when the likelihood of defense counsel's providing effective assistance is "so small" the court finds it to be virtually nil—the assistance provided by defense counsel is fatally compromised. More than a "warm body" is required to satisfy the Sixth Amendment. *United States ex rel Thomas v. O'Leary,* 856 F.2d 1011, 1015 (7th Cir. 1988) ("The Sixth Amendment right to counsel, of course, guarantees more than just a warm body to stand next to the accused during critical stages of the proceedings . . . ."). And, this is true whether counsel is retained or appointed.

Though the Supreme Court has not had occasion to decide such a case post- *Cronic,* one of our sister circuits has. The Sixth Circuit has found per se Sixth Amendment violations in three cases, and it has emphasized in each case that counsel's ability to discuss the matter with the defendant was sharply limited. *See United States v. Morris,* 470 F.3d 596, 601-02 (6th Cir. 2006) (holding appointment of counsel just before the preliminary examination, allowing only an "extremely short time period" during which to meet with a defendant in the "bull pen" cell—which lacked privacy and thereby "prohibit[ed] counsel from having a confidential, privileged conversation with the client before the hearing"—amounted to a per se Sixth Amendment violation under *Cronic*); *Mitchell v. Mason,* 325 F.3d 732, 744 (6th Cir. 2003) (affirming district court's grant of habeas where "no effort to consult with the [defendant] was made" by counsel, who met with the defendant for only six minutes across three meetings in the "bull pen," and where counsel was suspended from practicing law during the month preceding trial); *Hunt v. Mitchell,* 261 F.3d 575, 583 (6th Cir. 2001) (reversing denial of habeas where "counsel was required to proceed to voir dire without ever discussing the case with his client and without conducting any discovery or independent investigation of the facts"). Though

*Morris* and *Hunt* centered on late appointments, *Mason* hinged almost entirely on counsel's failure to communicate with the defendant; the defense counsel in *Mason* was appointed seven months before trial, and the court simply cited the attorney's suspension from law during the month prior to trial as another fact "contribut[ing] to the weight of the evidence that demonstrates that there was no consultation between [defendant] and his attorney prior to trial." *Mason*, 325 F.3d at 735. The Sixth Circuit found this to constitute "constructive denial of counsel" under *Cronic* and consequently presumed prejudice. *Id.* at 744.

To be sure, we have cautioned against "broaden[ing] the per-se prejudice exception to *Strickland*," warning that it would "add an extra layer of litigiousness to ineffective assistance law." *Glover v. Miro*, 262 F.3d 268, 277 (4th Cir. 2001). In that case, we were concerned that courts would not "regard trials . . . through a particularized lens [but] rather . . . through some broad-brush presumption of prejudice." *Id.* at 279. Indeed, we emphasized that our concern applied "especially [to] state trials on federal collateral review," where the court is far removed from the realities of the representation. *Id.* This concern is mitigated in the substitution context, as we are concerned only with cases in which a court has already made a *specific factual determination* (or, in a proper case, clearly erred in failing so to find) that communication between a given defendant and attorney had so broken down that an adequate defense could not be maintained. [5]

---

[5]*Glover* did briefly express a more general belief that "[t]o designate certain categories of cases as *Cronic* 'constructive denial' cases and others as *Strickland* 'deficient performance' cases would promote a new threshold area of debate and complicate the handling of this . . . area of contention on collateral review." *Id.* at 277. We simply note, as the *Glover* court itself did, *id.* at 276, that the Supreme Court elected to do precisely that in *Cronic*, setting out three categories of cases in which a presumption of prejudice attaches. *See Cronic*, 466 U.S. at 659-60.

The Ninth Circuit has already found that the erroneous denial of a substitution motion amounts to the constructive denial of counsel. As the court held in *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005):

> Where a criminal defendant has, with legitimate reason, completely lost trust in his attorney, and the trial court refuses to remove the attorney, the defendant is constructively denied counsel. This is true even where the breakdown is a result of the defendant's refusal to speak to counsel, unless the defendant's refusal to cooperate demonstrates unreasonable contumacy.

*Id.* at 1198 (internal citations and quotation marks omitted). In the very case that formulated the three factors we use in substitution analysis, *Brown v. Craven*, our sister circuit noted that "to compel one charged with grievous crime to undergo trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." 424 F.2d 1166, 1170 (9th Cir. 1970). For the foregoing reasons, we agree.

2.

As the above discussion makes plain, the standard of review we began to develop in *Gallop* requires further elaboration. The district court is far better situated than we are to observe and inquire into the state of the relationship between a defendant and his appointed counsel, and thus, where the district court has met its "obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction," *United States v. Mullen*, 32 F.3d 891, 896 (4th Cir. 1994), we apply the ordinary standard of review to its factual findings: clear error. *See, e.g., United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011) ("We review de novo the legal conclusion of the district

court, but review for clear error the district court's underlying factual findings.").

Once a district court has determined that defendant and his counsel's communication has so deteriorated as to prevent the mounting of an adequate defense, however, an appointment of substitute counsel is part and parcel of a defendant's Sixth Amendment right; the decision is *not* committed to the district court's discretion.[6]

Of course, as we noted in *Gallop*, a district court must consider the timeliness of defendant's request when determining whether the conflict complained of is genuine or merely a "transparent plot to bring about delay." 838 F.2d at 108; *see, e.g.*, *United States v. Kemache-Webster*, ___ F. Supp. 2d ___, 2011 WL 1375592, *4 (D. Md. April 11, 2011) (mem. op.) (district court, having appointed substitute counsel after defendant's first request, and then having appointed co-counsel after defendant's second request, denied defendant's third substitution request upon finding that defendant may be "motivated in his repeated attempts to obtain new counsel by a desire to delay his trial").

Likewise, a district court may consider whether a purported breakdown in attorney-client communication is, in fact, another such dilatory tactic. Even if a breakdown is genuine, after granting one or more substitution motions a court may

---

[6]Though *Gallop* briefly used the phrase "abuse of discretion" in its analysis (asking whether "failure by the trial court to proceed [i.e., inquire] further was not an abuse of discretion," 838 F.2d at 108), and thus the phrase has been taken up in our later opinions, *see, e.g.*, *Reevey*, 364 F.3d at 156, we of course have never meant that a district court, having applied the proper legal standard and determined that defendant had a right to substitute counsel, could then refuse such an appointment. As the Supreme Court noted in *Ornelas v. United States*, courts have sometimes confused the "abuse of discretion" and "clear error" standards when characterizing deferential review, but "'[c]lear error' . . . applies when reviewing questions of fact." 517 U.S. 690, 694 n.3 (1996).

well decline to grant further motions if it finds that yet another substitution would not remedy the problem. In such a case, it cannot be said that a defendant did not " *have* the Assistance of Counsel for his defence," U.S. const. art. VI (emphasis added), though defendant's obstinacy may have frustrated it. *See, e.g., United States v. DeTemple,* 162 F.3d 279, 289 (4th Cir. 1998) (finding no error in district court's refusal to permit fourth appointed counsel to withdraw, and noting that "[a] court can properly refuse a request for substitution of counsel when the defendant's own behavior creates the problem."); *United States v. Morsley,* 64 F.3d 907, 918 (4th Cir. 1995) (finding no error in district court's refusal to permit withdrawal of second appointed attorney after first appointed attorney was allowed to withdraw).

Here the district court refused Smith's first substitution request, and there is no indication in the record before us, nor has the Government ever suggested, that Smith's conflict with his appointed trial counsel was a deliberate tactical maneuver. Thus, in determining whether Smith's Sixth Amendment right to substitution was violated, we simply ask whether attorney-client communication had so broken down as to prevent the mounting of an adequate defense.

### III.

Before we can do so, we must determine the effect of Smith's interceding guilty plea. We said in *United States v. Moussaoui,* that "[w]hen a defendant pleads guilty, he waives all nonjurisdictional defects in the proceedings conducted prior to entry of the plea," and thus "has no non-jurisdictional ground upon which to attack that judgment except the inadequacy of the plea." 591 F.3d 263, 279 (4th Cir. 2010) (internal quotation marks omitted). And so, having unraveled Smith's embedded substitution claim, we turn now to its relationship to his contention that, as a result of the allegedly wrongful denial of his request for substitute counsel, his guilty plea was rendered involuntary.

## A.

To be valid, a guilty plea must be a "knowing, intelligent act[ ] done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748. The Supreme Court expressly noted in *Brady* that "an intelligent assessment of the relative advantages of pleading guilty is frequently impossible without the assistance of an attorney," which is why it is "clear that a guilty plea to a felony charge entered without counsel and without a waiver of counsel is invalid." *Id.* at 748 n.6. This is so because a guilty plea "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *McCarthy v. United States*, 394 U.S. 459, 466 (1969). In *Brady*, the Supreme Court held the defendant's guilty plea voluntary "even though the law promised him a lesser maximum penalty if he did not go to trial." 397 U.S. at 754. The *Brady* Court reasoned that "the possibly coercive impact of a promise of leniency could . . . be dissipated by the presence and advice of counsel." 397 U.S. at 754. Indeed, the Court compared the case to *Miranda*, where "[t]he presence of counsel" was held "the adequate protective device necessary" to counteract the coerciveness of "police interrogation." *Id.* at 754 n.12 (quoting *Miranda v. Arizona*, 384 U.S. 436, 466 (1966)). Where there has been a breakdown in communication between defendant and defense counsel such that the mounting of an adequate defense would be impossible, this "protective device" is absent.

We held in *Moussaoui* that violations of a defendant's Fifth and Sixth Amendment rights to obtain counsel of choice, to proceed pro se, and to be present during critical stages of the proceedings, among others, did not give rise to structural error and did not render his guilty plea involuntary, since, after defendant had "submit[ted] to an unconstitutional trial," he "could seek an appellate remedy for the constitutional violations" if convicted. 591 F.3d at 280.

But *Moussaoui* does not extend so far as to shield from challenge the total absence of the assistance of counsel. It is well settled that the denial of assistance of counsel at a "critical stage" of the proceedings is constitutional error not subject to a prejudice inquiry. *Cronic*, 466 U.S. at 659. *Moussaoui* itself recognized this, noting that

> [i]n unusual circumstances, a defendant may obtain reversal of his conviction based on the inadequacy of counsel even in the absence of a showing that would satisfy *Hill* or *Strickland*. Such a constructive denial of counsel results from circumstances where "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided" at all. *Cronic*, 466 U.S. at 654 n. 11.

591 F.3d at 288-89 (internal quotation marks and citations omitted). The actual or constructive denial of counsel constitutes the type of "structural defect" that "def[ies] analysis by 'harmless-error' standards because [it] affects the framework within which the trial proceeds [or a guilty plea is negotiated], and [is] not simply an error in the trial process itself." *Gonzalez-Lopez*, 548 U.S. at 148 (internal quotation marks omitted). Structural errors "deprive defendants of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence and no criminal punishment may be regarded as fundamentally fair." *Neder v. United States*, 527 U.S. 1, 8-9 (1999) (internal quotation marks omitted). To contend that the lack of assistance of counsel is made unassailable by an uncounseled plea would be unfathomable.

Furthermore, Smith does not simply argue, like the appellant in *Moussaoui*, that his plea was coerced because he would otherwise have been forced to continue to a trial that violated his Sixth Amendment rights. Rather, Smith argues that his plea was invalid because, as an effectively *uncounseled* plea, it was not a "knowing, intelligent act[ ] done with

sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748. "If the advice of counsel falls below the minimum required by the Sixth Amendment, the guilty plea cannot be deemed knowing and voluntary," and "[i]t is clear that a constructive denial of counsel falls short of the minimum requirements of the Sixth Amendment." *Childress v. Johnson*, 103 F.3d 1221, 1231 n.14 (5th Cir. 1997) (cited with approval in *Moussaoui*, 591 F.3d at 289, for "applying *Cronic* to the guilty plea context"). Neither *Moussaoui*'s reasoning nor its result does anything to disturb this fundamental constitutional requirement of a valid guilty plea.

Thus, if Smith could show that he was denied his Sixth Amendment right to the appointment of a substitute and thus constructively denied counsel, then that "protective device" was functionally absent and he would establish that his guilty plea was involuntary. As a constitutionally compelled finding of involuntariness would immediately follow from the underlying Sixth Amendment violation, the fact that we "[t]ypically . . . review the voluntariness of a guilty plea de novo," *United States v. General*, 278 F.3d 389, 393 (4th Cir. 2002), *cert. denied*, 536 U.S. 950 (2002), is of no moment, as a distinct voluntariness inquiry is not necessary in the context of a constructive denial of counsel. Inversely, if the denial of Smith's request for substitution is found *not* to violate his Sixth Amendment right to the assistance of counsel, it is difficult to imagine that his conflict with counsel would so taint the guilty plea as to make it involuntary. But in the rare case in which such a claim might be cognizable on direct review, we would separately consider the voluntariness of the plea and review any preserved objection *de novo, id.*, "considering all of the relevant circumstances surrounding it," *Brady*, 397 U.S. at 749, as guided by the prescriptions of Federal Rule of Criminal Procedure 11.

B.

Mindful of the above principles, and reviewing the whole record in the case at bar, we find that Smith establishes nei-

ther a Sixth Amendment violation nor the involuntariness of his guilty plea. Though there was undoubtedly considerable conflict between Smith and counsel, and although the district court erred in telling Smith he had "been appointed one lawyer, and one lawyer is your free limit," the evidence here does not establish that Smith was constructively without counsel when considering the Government's plea offer and then entering his guilty plea. Because we find counsel continued to provide meaningful assistance to Smith prior to and during the plea hearing, neither do we find that this conflict independently tainted the plea. As Smith raises no other ground on which we might find involuntariness, we affirm his conviction.

Smith and counsel appear to have argued before the initial Rule 11 hearing over counsel's discovery agreement with the Government and the likely success of a petition for a writ of *coram nobis*, and counsel seems to have informed Smith that he could (and perhaps should) request the appointment of substitute counsel if he wished. Smith expressed concern in his letters to the court that counsel was angry with him and might "sabotage[ ]" his defense, J.A. 59, but such fears alone do not establish a breakdown in communication.

The district court inquired into the source of the conflict at both the initial Rule 11 hearing and again two weeks later, when the hearing was resumed. Though best practice would include an express finding on the record about the state of communication between defendant and counsel (best developed in an on-the-record colloquy in the absence of government counsel), it is clear from the colloquies here that communication had not yet fractured to the point where mounting an adequate defense would have been frustrated. According to counsel's uncontested statements at the later rearraignment hearing, counsel had visited Smith in detention either four or five times, in addition to meetings in the courthouse, and at the time of the plea, Smith and counsel were on speaking terms.

Before  Smith's plea, the district court told Smith, "If you've got a problem, you've got to [let me] know about it now," and Smith replied that counsel was "all right" and that he, Smith, was "all good with it." J.A. 91. Smith explained, "I  mean we had our ups and downs, but I'm here to go through  with [the plea] today."  *Id.*  The court specifically asked if the two had "worked out those ups and downs," and Smith  replied, "Yes."  *Id.*  As counsel told the court at that hearing, the pair had weathered "some disagreement and dis-satisfaction . . . earlier" and were "now back on track." J.A. 104-05.  He told the court that Smith was "satisfied that I'm doing everything that I can for him." J.A. 105.

Smith can point to no evidence of a conclusive break with counsel before his plea, and evidence of disagreements that were resolved before the plea does not establish a breakdown of communication. Thus, Smith's contention that his guilty plea was involuntary fails.

## IV.

We look next to Smith's claim that the district court erred in denying his renewed request for substitute counsel at sentencing.  As explained above, we consider the "adequacy of the court's inquiry into the defendant's complaint,"  *Gallop*, 838 F.2d at 108, and, most crucially, determine whether "the extent of the breakdown" in attorney-client communication "prevent[ed]  the ability to conduct an adequate defense," *Johnson*, 114 F.3d at 443. We review the district court's factual findings concerning the state of that communication for clear error.

## A.

We first consider the extent of the court's inquiry into the attorney-client conflict. As we explained in  *Mullen*, "[w]hen a  defendant raises a seemingly substantial complaint about counsel, the judge has an obligation to inquire thoroughly into

the factual basis of defendant's dissatisfaction." 32 F.3d at 896. Though we are reviewing only the court's refusal to appoint substitute counsel at the sentencing hearing, we consider the adequacy of the court's investigation throughout since Smith's request had been a continuing one from the beginning of the proceedings.

At the Rule 11 hearings, the district court repeatedly asked both Smith and counsel about their problems. At the initial hearing, after Smith complained that he had "ask[ed] [counsel] to do certain things to help me in this case, and he's not doing it," the judge asked, "What do you want him to do?" J.A. 63. Smith explained that he wanted counsel to file a petition for a writ of *coram nobis*, and the court, after an extended aside suggesting that Smith was angry about the poor legal position he was in rather than with counsel's representation, then questioned counsel about the petition at some length.

At the resumed hearing two weeks later, during the plea colloquy, the court asked Smith if counsel had "answered all of your questions," "done anything you told him not to do," or "refused to do something that you told him to do." J.A. 91. The judge warned Smith to "[s]peak now or forever hold your peace," and told him "[i]f you've got a problem, you've got to [let me] know about it now." J.A. 91. Smith replied, "I mean sometimes, I mean, I mean he's all right. I'm all good with it," and then told the court, "I mean we had our ups and downs, but I'm here to go through with it today." J.A. 91. The court followed up by asking if Smith and counsel had "worked out those ups and downs," and Smith said they had. J.A. 91. When the judge then asked if Smith was "currently satisfied with [counsel's] services," Smith told him, "I have no choice but to be, Your Honor. I'm keeping it honest, Your Honor." J.A. 92. The court asked a final question, if counsel had "done something you didn't want him to do," and when Smith answered that he hadn't, it moved on. J.A. 92.

Less inquiry was needed at the sentencing hearing, as the state of Smith's relationship with counsel was well-known to

the court. At the beginning of the sentencing hearing, held on August 14, 2009, counsel explained that he had last met with Smith on June 24—a twenty-minute affair that was shortly broken up by correctional officers after Smith became belligerent—and last contacted him via letter on June 30. Counsel told the court that "I do believe that our relationship, such as it has ever been, has obviously broken down to the point where we are not able to sit down and have a rational, reasonable discussion about this case and about the issues in this case." J.A. 113.

The court did inquire about the state of Smith's *coram nobis* petition; counsel explained that Smith had waived his right to seek such relief by failing to seek leave to appeal his prior convictions, and that this news was the cause of the last altercation between them on June 24th. The court also asked Smith whether he had reviewed his PSR, and Smith confirmed that he had. And when Smith addressed the court to again ask for appointment of substitute counsel, complaining that counsel gave Smith's family "attitude," "d[id]n't call them back, and "d[id]n't do anything [Smith] asked him to do," the court interrupted to ask, "What did you ask him to do?" J.A. 114. Smith's reply did not raise any significant new issues, and the court ended its questioning there.

As the source of contention—the *coram nobis* petition—had been thoroughly discussed at Smith's rearraignment hearings, and the state of Smith and counsel's relationship was apparent, the court's inquiry into the matter was thorough.

## B.

Before addressing the attorney-client relationship itself, we consider the Government's argument that Smith's request for a substitution at sentencing was "not timely." Br. of Appellee, at 51. The Government concedes that Smith's first request for substitution during the Rule 11 proceedings was "timely," Br.

of Appellee, at 27, but it argues that we should analyze Smith's renewed request at the sentencing hearing as an entirely distinct motion, and consequently find it untimely. Yet it can cite no precedent for this contention, nor can it explain why we should not simply treat Smith's third request for substitute counsel at sentencing as a renewed objection to the court's denial of his motion for substitution.

And as we explained at length in Part II, *supra*, while courts are properly concerned with the "[governmental] interest in proceeding on schedule," *Gallop*, 838 F.2d 105, mere convenience cannot counterbalance a defendant's right to counsel at a critical stage of the proceedings. As we have said, timeliness is surely highly relevant when an eleventh-hour request is found to be a "transparent plot to bring about delay," *Gallop*, 838 F.2d at 108, but we have never found it a bar when a substitution claim is otherwise meritorious. Indeed, we have previously found timely a motion raised just before trial where we had determined "[a]ny blame for delay . . . lies with the government, not with [the defendant]." *Mullen*, 32 F.3d at 896.

The Government suggests that the continued Rule 11 hearing served as a break in the conflict that effectively reset the clock for a timely substitution motion. Though, as we discussed above, the court's colloquy with Smith at the continued plea hearing indicates that communication had not yet permanently broken down between Smith and counsel, Smith did make clear that his desire to be appointed substitute counsel had not changed. When the court asked Smith if he was "currently satisfied with [counsel's] services," Smith replied, "*I have no choice but to be*, Your Honor. I'm keeping it honest, Your Honor." J.A. 92 (emphasis added). Smith was referring to the court's earlier ruling on his motion to be appointed substitute counsel, when the court had erroneously told Smith that, no matter the difficulties he had with counsel, "one lawyer is your free limit," and that if he was unable to "[l]earn to work with [counsel]" and lacked the funds to hire his own

attorney, he would be forced to proceed pro se; these, the judge said, were " *the only options you've got*." J.A. 62 (emphasis added). Thus it cannot "easily be said that . . . Smith abandoned any request for substitute counsel . . . ." Br. of Appellee, at 36. To use Smith's resignation to the very misstatement of legal principle he challenges before us as grounds to find waiver of that challenge or as cause to find renewed complaints merely dilatory would be wholly unwarranted.

## C.

Finally, we consider whether Smith and counsel's communication had so broken down that Smith was kept from mounting an adequate presentation in support of leniency at his sentencing hearing. As the district court made no findings on this point, our review must be de novo. *Cf. United States v. Ellis*, 121 F.3d 908, 927 (4th Cir. 1997) (noting that though lower court's factual findings concerning prosecutorial misconduct claim are reviewed for clear error, "if . . . no findings exist, our review is plenary"). The record evidence is clear and fulsome: Smith (1) discussed parts of the PSR report with counsel; (2) entered objections through both counsel and his own eighteen-page sentencing memorandum, and, together with counsel, told the court that no further review was needed; and (3) discussed the case with counsel before the hearing, giving counsel documents pertaining to self-improvement programs in which Smith participated during his detention. We do not find, in the face of this record, that there was a breakdown in communication sufficient to undermine Smith's opportunity for a complete presentation at sentencing.

To be sure, by the time of the sentencing hearing, on August 14, 2009, the attorney-client relationship appears to have suffered significant damage. Smith reminded the court: "last time I was here, if you notice, me and [counsel], we ain't getting along, and it's still continuing . . . ." J.A. 110. He also told the court, "I feel as though [counsel] ain't got my best

interests in representing me, and he just told me downstairs that he would let you know yourself that he's withdrawing from being my counsel." J.A. 110. Counsel then explained that the two had last met on June 24 (51 days prior) at the detention center, that

> [a]lmost immediately, Mr. Smith directed the discussion, if you we can call it a discussion, towards the issue of *coram nobis*, and frankly Mr. Smith got quite belligerent, demanding to know, quote, why the fuck don't you do what I tell you to do, end quote, and words to that effect, and the conversation or the discussion began to get out of hand. The guards came into the room and hustled him out of there back to his cell. The event lasted — the interview, including the disagreeable part, lasted about 20 minutes total.

J.A. 111-12. Counsel had mailed Smith a letter on June 30 stating, among other things, that he had sent a letter to the probation officer regarding the exceptions they had discussed to the PSR, and that Smith should promptly mail exceptions to the parts of the PSR they had not discussed, as the deadline was June 29 (as he says he told Smith at the June 24 meeting). J.A. 112-13.

Counsel also told the court that "I do believe that our relationship, such as it has ever been, has obviously broken down to the point where we are not able to sit down and have a rational, reasonable discussion about this case and about the issues in this case." J.A. 113. Though we take counsel's representation very seriously here, it is not determinative where other facts show that Smith and counsel were able to communicate well enough to present an adequate claim for leniency to the court at sentencing.

Both counsel and Smith were asked about Smith's review of the PSR, and neither requested more time. When counsel

was asked if he had reviewed the PSR with Smith, counsel answered, "Only to the extent that I discussed with the Court earlier. We did not complete the review." J.A. 119. But when the court asked if counsel wanted "some time to finish your review of the presentence report with Mr. Smith," counsel declined, saying only, "Your Honor, Mr. Smith has had the report since shortly after June 11." J.A. 119. The court then asked Mr. Smith if he had "read the presentence report," and Smith answered, "Yes. I read it, Your Honor." J.A. 119. When the judge asked Smith for "deletions, additions, or corrections," the record reflects that Smith "conferr[ed] with counsel" before explaining to the court that the PSR incorrectly stated that he had requested a "mental health program," when he had asked for a "drug treatment program." J.A. 119.

Counsel then went on to address Smith's eighteen-page "Memorandum in Aid of Sentencing." J.A. 121. Counsel noted that Smith's friend, who had helped draft the memorandum, had "obviously added some considerable experience and insight" to it, and counsel then took up one of the points argued in the memorandum: that Smith should receive credit for the harshness of a portion of his pretrial detention. Smith also gave to counsel a letter confirming Smith's participation in the "Creating Lasting Family Connections Program" at the Allegany County Detention Center and a certificate of completion from a "men's issues group," also at Allegany County, both of which counsel presented to the court. J.A. 123.

These facts are unlike those of *Mullen*, where there had been "no contact whatsoever" for "a period of more than one month," aside from a failed attempt by the attorney to see Mullen the day before trial, when Mullen refused to see him. 32 F.3d at 896. Counsel told the court "several times that communication had broken down," and Mullen refused to consult with counsel during the trial. *Id.* at 896-97. Here Smith and counsel were able to meet just before the hearing, where Smith gave counsel the letter and certificate, and conferred together during the hearing. The *Mullen* panel was

especially troubled that there had been no "consultation [by defense counsel] with Mullen about the facts of her case; in particular, [counsel] could not have inquired into whether there was exculpatory evidence that only Mullen may have known about." *Id.* at 897. Here Smith and counsel had conferred several times, and there is no suggestion by Smith that communication had broken down to the extent that he would not have brought to counsel's attention additional facts relevant to his sentencing.

We candidly acknowledge what the record unmistakably reflects: counsel did not feel he was fully able to dispense advice to Smith after their meeting of June 24. We expect counsel to be forthright with the court (and not timid) when, in counsel's professional judgment, and as an officer of the court, counsel's ability to render at sentencing the assistance commanded by the Sixth Amendment exceeds counsel's capacity under the circumstances. But where, as here, counsel and client actually met to discuss sentencing, reviewed (some of) the PSR, and communicated just before and during the hearing sufficiently to allow counsel to present his client's concerns to the court cogently and persuasively, we do not find that communication had so broken down that counsel was prevented from rendering genuinely effective assistance. Thus, we do not conclude that a remand for resentencing is appropriate on this record.

## V.

The district court misspoke in its initial answer to Smith's requests for substitute counsel in stating that "one lawyer is your free limit." J.A. 62. There is no one-free-lawyer rule. But the court's subsequent inquiry was thorough and demonstrated a genuine sensitivity to Smith's concerns, both as to the entry of Smith's guilty plea and at sentencing. We are satisfied after a review of the whole record that the denial of Smith's requests did not violate his Fifth or Sixth Amendment rights.

Our holding is straightforward. Like spouses, co-workers and best friends, court-appointed counsel and their indigent-defendant clients are people, too. Human frailty being what we all know it to be, there will be occasions in such attorney-client pairings in which, as in other human relationships, an unremediable inability to communicate and work together in the achievement of a shared goal will defeat the achievement of the shared objective. In the contemplation of the Fifth and Sixth Amendments, a trial court has an obligation, when such an impediment to counsel's ability to provide the assistance which is his client's constitutional guarantee appears, to make inquiry and, when appropriate, to appoint substitute counsel.

The judgment of the district court is

*AFFIRMED*.

AGEE, Circuit Judge, concurring in part and concurring in the judgment:

I join in all but part II.B. of the Court's opinion and concur in the judgment. Part II.B. is to note the standard of review on appeal and I concur, of course, that "[w]e review de novo the legal conclusion of the district court, but review for clear error the district court's underlying factual findings." Slip op. at 17 (quoting *United States v. Foster*, 634 F.3d 243, 246 (4th Cir. 2011)). Moreover, if the district court errs as a matter of law, it has by definition committed an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996) ("A district court by definition abuses its discretion when it makes an error of law.") (citation omitted). But before reaching these conclusions, part II.B. seems to wander afield and recite out of circuit cases which have limited application to the standard of review. I write separately to note that this discourse should not be taken as other than dicta or have precedential value.

The part II.B.1. discussion cites to a number of out of circuit cases whose particular points might be correct as abstract

principles, but which have limited application to the standard of review and thus could be taken out of context in ways not pertinent to the very difficult fact-specific deliberations for the district court in a substitution of counsel matter. As we have observed, cases like this one are "notoriously" fact-specific. *United States v. Jones*, 977 F.2d 105, 111 (4th Cir. 1992); *see also United States v. Gallop*, 838 F.2d 105, 108 (4th Cir. 1988) (setting forth the fact-intensive inquiry courts utilize in reviewing a denial of a motion for substitution of counsel). Hence, while one could envision some set of facts on which our sister circuits' analyses might aid our analysis, this is not — and need not be — that case.

For example, it would be the bizarre case where a denial of a substitution of counsel would ever be, as a matter of law, a constructive denial of counsel "where the breakdown [of attorney-client relationship] is a result of the defendant's refusal to speak to counsel." Slip op. at 16-17 (quoting *Daniels v. Woodford*, 428 F.3d 1181, 1198 (9th Cir. 2005)). *See e.g.*, *United States v. Roston*, 986 F.2d 1287, 1292-93 (9th Cir. 1993) (upholding denial of motion for substitution of counsel where defendant "attempted to use [his] refusal to communicate to get a new lawyer."); *United States v. Big Lake*, 399 Fed. Appx. 298, 299-300 (9th Cir. 2010) (unpublished) (same); *Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985) ("A defendant, by unreasonable silence or intentional lack of cooperation, cannot thwart the law as to appointment of counsel.").

Part II.B.2. aptly sets forth the standard of review to apply in resolving this appeal. Because in my view there is no reason to go further, and to avoid confusing future litigants, I would limit our statement of the proper standard of review to that identified in part II.B.2.

For these reasons, I concur in the judgment as to Part II.B.