**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 12-7419**

─────────────

UNITED STATES OF AMERICA,

                Petitioner – Appellee,

      v.

THOMAS BLACKLEDGE,

                Respondent - Appellant.

─────────────

Appeal from the United States District Court for the Eastern
District of North Carolina, at Raleigh.   James C. Dever III,
Chief District Judge.  (5:09-hc-02118-D-JG)

─────────────

Argued:  January 30, 2014          Decided:  May 5, 2014

─────────────

Before GREGORY, SHEDD, and KEENAN, Circuit Judges.

─────────────

Vacated and remanded by published opinion.  Judge Gregory wrote
the majority opinion, in which Judge Keenan joined.  Judge Shedd
wrote a dissenting opinion.

─────────────

**ARGUED:**  Richard Croutharmel, Raleigh, North Carolina, for
Appellant.    Denise  Walker,  OFFICE  OF  THE  UNITED  STATES
ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON  BRIEF:**
Thomas G. Walker, United States Attorney, Rudy A. Renfer, Edward
D. Gray, Assistant United States Attorneys, OFFICE OF THE UNITED
STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

─────────────

GREGORY, Circuit Judge:

Respondent-Appellant Thomas Blackledge has been civilly committed as a sexually dangerous person under the Adam Walsh Child Protection and Safety Act of 2006 ("Adam Walsh Act"), codified at 18 U.S.C. §§ 4247-48. Prior to a hearing on his commitment, Blackledge successfully moved for the appointment of an expert forensic examiner, who opined that he was indeed a sexually dangerous person. Blackledge then sought the appointment of a second expert and an extension of the deadline for discovery. A magistrate judge denied both motions without prejudice, and when counsel renewed the motions after the discovery deadline had passed, the motions were again denied. Citing an internal ethical conflict, Blackledge's attorney later moved to withdraw as counsel, which the magistrate judge denied. Counsel appealed the ruling to the district court and filed a second motion to withdraw, this time also noting that Blackledge had filed a bar complaint against her. The district court denied both the appeal of the magistrate judge's ruling and the second motion to withdraw.

On appeal, Blackledge challenges the denial of the motions to extend and reopen the discovery period, motions to withdraw as counsel, and motions to appoint a second expert. Because we find that the district court abused its discretion in denying the motions to withdraw as counsel, we vacate and remand.

2

As relevant to these proceedings, we briefly summarize Blackledge's criminal history.[1] In 1960, at age 15, Blackledge was convicted of first-degree murder in Wyoming for bludgeoning his 15-year-old girlfriend to death after she rebuffed his sexual advances. He was sentenced to life imprisonment, but released at age 23 after serving 8 years in state prison. On October 22, 1986, Blackledge was sentenced in the United States District Court for the District of Colorado to 12 years of imprisonment and 5 years of probation for several counts of mailing and producing child pornography. For the same conduct, he was also sentenced to 20 years' imprisonment for sexual exploitation of children in Larimer County, Colorado and in Weld County, Colorado, to run concurrently with his federal sentence. Blackledge also self-reported several undetected incidents of child molestation, involving between eight and twelve child victims ranging from age 5 to age 17.

Following his release, Blackledge violated the terms of his probation by possessing images of nude children on his home computer. He was consequently sentenced on April 27, 2005 to 6

[1] The following pertinent factual findings are not disputed except as otherwise noted, and to the extent that there is a dispute, we construe the evidence in the light most favorable to the Government as the prevailing party before the district court. See United States v. Antone, 742 F.3d 151, 155 n.1 (4th Cir. 2014).

years' imprisonment by the United States District Court for the District of Colorado. He was also sentenced to 6 years' imprisonment in Weld County, Colorado on May 3, 2004 for one count of sexual exploitation, to run concurrent with the federal sentence for the probation violation. Blackledge had an expected release date of September 23, 2009. On September 15, 2009, however, the Government filed a Certification of a Sexually Dangerous Person ("Certification") pursuant to 18 U.S.C. § 4248(a) in the United States District Court for the Eastern District of North Carolina, and his release was stayed.

The court appointed the Federal Public Defender's Office to represent Blackledge, and on March 11, 2011, Sonya Allen ("Attorney Allen") entered an appearance on Blackledge's behalf. Attorney Allen moved for the appointment of Dr. Terrence Campbell as an expert forensic examiner, which a magistrate judge granted on August 4, 2011. After interviewing Blackledge and considering various materials, Dr. Campbell opined that he was indeed a sexually dangerous person under the Adam Walsh Act.

On October 11, 2011, Attorney Allen moved for the appointment of a second expert, Dr. Joseph Plaud, and requested an extension of the time for discovery. The magistrate judge denied the motions on November 4, 2011 without prejudice, finding that Blackledge failed to show the need for the appointment of a second expert. The magistrate judge granted a

4

later request to extend discovery until December 22, 2011, and the district court set a bench trial for June 14, 2012. On April 17, 2012, two additional attorneys entered appearances as Attorney Allen's co-counsel, and the court continued the trial until August 2, 2012. On June 14, 2012, Attorney Allen filed a sealed motion renewing Blackledge's request to appoint Dr. Plaud and asking the court to reopen discovery and continue the trial. The magistrate judge denied the motions on July 2, 2012, finding that Blackledge again failed to show good cause for the appointment of a second expert, and that appointment at that stage would disrupt the court's prior scheduling orders.

On July 10, 2012, Attorney Allen filed a motion to withdraw as counsel on the ground that an internal conflict had arisen and she could "no longer continue to ethically represent" Blackledge. J.A. 80. Speaking carefully to avoid violating client confidences or revealing trial strategies, Attorney Allen represented at a hearing on the motion that her internal ethical conflict arose from the fact that Blackledge requested to see certain items that she could not provide him. She added that Blackledge wished to proceed with new counsel and that she had located a panel attorney experienced in § 4248 hearings who could take over the matter immediately. Blackledge also stated at the motions hearing that Attorney Allen had failed to provide

5

him certain documents he requested, and that he felt ignored by her, which made it very difficult for them to communicate.

Blackledge complained in particular about Attorney Allen's failure to obtain a second expert, and Attorney Allen explained that she did not renew the motion earlier because she thought she had more time to do so. While Attorney Allen asserted that Dr. Plaud said only that it was possible that he would find Blackledge not to be a sexually dangerous person, her co-counsel represented that Dr. Plaud had preliminarily indicated that he could testify favorably for Blackledge. Attorney Allen asserted that she had failed at allaying Blackledge's concerns about his defense, and that, as a result of her error, they no longer had a rapport that allowed him to trust her. When asked if she could represent Blackledge zealously if the motion were denied, Attorney Allen stated that "it would be with great difficulty," though she is a professional and "would certainly do [her] job." J.A. 101. She opined that increasing the frequency of communications would not repair their relationship since she could not change her prior failure to timely renew the motion, which was the content of the discussions.

The magistrate judge denied the motion to withdraw, finding that it was untimely and that there was no breakdown in the attorney-client communications that prevented an adequate defense. On July 23, 2012, Attorney Allen appealed the

6

magistrate judge's ruling to the district court, and on July 30, 2012, she filed a second motion to withdraw. The second motion asserted that Blackledge had filed a state bar grievance against her, causing a conflict of interest where she could not defend against the bar complaint while also representing Blackledge.

The bench trial began on August 2, 2012, and the district court first took up the appeal of the magistrate judge's ruling and the second motion to withdraw. Attorney Allen described her relationship with Blackledge as follows: "our relationship has deteriorated to a point that we cannot discuss his case, strategies of his case. We cannot effectively communicate. That has tied my hands with regard to being able to represent him effectively." J.A. 148-49. She continued: "One of the essential parts of defending someone would be whether they decide to testify or not and how you would go about preparing them for that testimony. That's not even something I can discuss with Mr. Blackledge, so we have not been able to address that appropriately." J.A. 151. Blackledge also explained to the court that he had not "even really had any trial preparation with [Attorney Allen]" and that he had not seen her "for quite sometime [sic]." Id. Attorney Allen added that the bar complaint had put her "at odds with" Blackledge. J.A. 149.

The district court told Blackledge that he might have to proceed pro se if the motions were granted, and Blackledge

stated that he would proceed with Attorney Allen if forced to because he could not defend himself. The court denied the appeal and the second motion, finding that Attorney Allen had not abandoned Blackledge as he claimed and that there was not a breakdown in communications that would prevent an adequate defense. Attorney Allen moved to bifurcate the trial so that the available witnesses could testify, but Blackledge would be allowed to later present an expert opinion from Dr. Plaud. The court denied the motion to bifurcate, and the trial proceeded.

At trial, the Government presented the testimony of two expert witnesses, Dr. Christopher North and Dr. Campbell, and the written report of a third expert witness, Dr. Tonya Cunic. All three experts diagnosed Blackledge with pedophilia — sexually attracted to boys and girls, non-exclusive type — among other psychiatric disorders. All three experts concluded that Blackledge met the criteria for a sexually dangerous person under § 4248. Blackledge did not testify or present evidence.

On August 10, 2012, the court found by clear and convincing evidence that Blackledge is a sexually dangerous person under the Adam Walsh Act and ordered his commitment. The court specifically found that Blackledge engaged in child molestation and sexually violent conduct, suffers from pedophilia and antisocial personality disorder, and, as a result, would have serious difficulty refraining from reoffending.

8

An individual in the custody of the Federal Bureau of Prisons may be civilly committed under § 4248 if the Government proves in a hearing that the person is a sexually dangerous person. 18 U.S.C. § 4248(d). The Government must prove each of the following by clear and convincing evidence: (1) the person "has engaged or attempted to engage in sexually violent conduct or child molestation" ("prior conduct" element); (2) the person "suffers from a serious mental illness, abnormality, or disorder" ("serious mental illness" element); and (3) "as a result of" such condition, the person "would have serious difficulty in refraining from sexually violent conduct or child molestation if released" ("volitional impairment" element). 18 U.S.C. §§ 4247(a)(5), (6), 4248. United States v. Hall, 664 F.3d 456, 458 (4th Cir. 2012). Blackledge has stipulated that he engaged in sexually violent conduct or child molestation or attempted to do so, and that he suffers from pedophilia, a serious mental illness, abnormality, or disorder. The trial thus centered on whether he satisfies the volitional impairment element.

Blackledge argues on appeal that the court abused its discretion in denying his motions to extend and reopen discovery, motions to withdraw as counsel, and motions to appoint Dr. Plaud. We hold that the court did abuse its

9

discretion in denying the motions to withdraw and remand for the court to reconsider these motions by engaging in a thorough inquiry as to the extent of Attorney Allen's conflict. We therefore need not address Blackledge's remaining arguments.

III.

A.

We review the denial of a motion to withdraw for abuse of discretion. United States v. Johnson, 114 F.3d 435, 442 (4th Cir. 1997) (citing United States v. Mullen, 32 F.3d 891, 895 (4th Cir. 1994)). Blackledge argues that Attorney Allen abandoned his case during the time in which she should have renewed the motion to appoint Dr. Plaud, and thus had a significant conflict presented by her interest in protecting her own professional reputation thereafter. He maintains that because he has a right to counsel under the Adam Walsh Act,[2] this right necessarily includes a due process right to the effective assistance of counsel. Blackledge asserts that the court abused its discretion when it denied the motions because it forced him to proceed with ineffective assistance of counsel.

---

[2] "At a hearing ordered pursuant to [the Adam Walsh Act] the person whose mental condition is the subject of the hearing shall be represented by counsel and, if he is financially unable to obtain adequate representation, counsel shall be appointed for him pursuant to section 3006A." 18 U.S.C. § 4247(d).

10

The Government argues in response that Blackledge was not prejudiced by the denial of the motions because he remained represented by one of Attorney Allen's co-counsel,[3] and because Attorney Allen indicated that she was capable of representing him despite her asserted internal ethical conflict and the bar complaint, albeit with great difficulty. The Government further argues that Attorney Allen ably represented Blackledge, filing motions on his behalf during the time in which he says he was abandoned and cross-examining the relevant witnesses at trial.

B.

In deciding whether a district court has abused its discretion in denying a motion to withdraw or to substitute counsel, we consider three factors: (1) timeliness of the motion; (2) adequacy of the court's inquiry; and (3) "whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988) (internal citations omitted). If the court abused its discretion, the ruling is subject to harmless error review. See United States v. Horton, 693 F.3d 463, 467 (4th Cir. 2012). We review the court's factual findings for clear error and its legal conclusions de novo. Hall, 664 F.3d at 462. "A finding

_____

[3] The second co-counsel, attorney Katherine Shea, withdrew as co-counsel on July 24, 2012.

11

is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. (internal citations omitted).

Turning to the first factor, it appears that at least the second motion to withdraw was untimely. Attorney Allen filed the first motion on July 10, 2012, slightly more than three weeks before trial. The magistrate judge noted the court's difficulty in scheduling hearings so that all the necessary witnesses could be available, and Blackledge acknowledged that granting the motion would require another continuance so that new counsel could prepare. Consistent with our prior holding that a motion to substitute counsel filed two weeks before the relevant hearing was timely, the initial motion to withdraw in this case was likely timely. See United States v. Jennette, 387 F. App'x 303, 307 (4th Cir. 2010). However, the second motion was filed on July 30, 2012, only three days before trial. The district court noted that it had a very busy trial calendar for August and September, and that granting the motion at that point would frustrate its scheduling orders. Although the district court was certainly on notice that Attorney Allen wished to withdraw as counsel after the first motion was filed, "[i]n considering timeliness when a defendant requests substitution of counsel, 'the court is entitled to take into account the . . .

12

public interest in proceeding on schedule.'" Mullen, 32 F.3d at 895 (internal citations omitted).  As such, this factor weighs somewhat in favor of the court's ruling.

Turning to the second factor, however, the record reveals that the district court failed to engage in an adequate inquiry. "When a defendant raises a seemingly substantial complaint about counsel, the judge 'has an obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction.'" Id. at 896 (internal citations omitted).  "An inquiry into the reasons for a defendant's dissatisfaction with his or her lawyer is necessary for the trial court to determine whether good cause for substitution of counsel exists." Id. (internal citations omitted).  "The district court is far better situated than we are to observe and inquire into the state of the relationship between a defendant and his appointed counsel, and thus, where the district court has met its 'obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction,' . . . we apply the ordinary standard of review to its factual findings: clear error." United States v. Smith, 640 F.3d 580, 590 (4th Cir. 2011) (citing Mullen, 32 F.3d at 896).  While motions to substitute counsel often arise at the defendant's urging, when the attorney also seeks to withdraw, the court must thoroughly inquire into the factual basis of any conflicts asserted by counsel.

13

In this case, the district court did not meet its obligation to thoroughly inquire into the extent of the communications breakdown or the basis of the asserted conflict. Despite the representations from Attorney Allen and Blackledge on the morning of trial that they had not done any trial preparation or spoken about whether Blackledge would testify, the court did not ask when they had last seen each other or communicated about the case.[4] Tasked with reviewing the motions de novo, the district court erred in failing to examine how the communications between Blackledge and Attorney Allen had fared since the magistrate judge's inquiry two weeks earlier. The court emphasized Attorney Allen's competence as a lawyer, but an attorney's competence cannot cut short the inquiry because, "[e]ven if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense." United States v. Musa, 220 F.3d 1096, 1102 (9th Cir. 2000).

---

[4] Despite Attorney Allen's assertion that she and Blackledge could no longer effectively discuss his case, the dissent infers that they were indeed able to communicate from the fact that she filed proposed findings of fact and conclusions of law on July 26, 2012. However, the fact that Attorney Allen filed this pleading on Blackledge's behalf does not establish that they were actually able to communicate at this time, and indeed, such an inference is undermined by the fact that she filed the second motion to withdraw only four days later. Had the district court followed the "best practice" of making "an express finding on the record about the state of communication between defendant and counsel," Smith, 640 F.3d at 594, then perhaps this Court would not be left wondering when Attorney Allen and Blackledge had last meaningfully communicated about his defense.

14

Most significantly, the district court failed entirely to inquire about the internal ethical conflict that Attorney Allen had earlier raised and whether this had been resolved since the first hearing. The court's failure to probe deeply into the basis of Attorney Allen's conflict seriously undermines its decision, and this factor weighs heavily against the court's ruling.

Turning to the third factor, because the district court failed to engage in an adequate inquiry, its factual determination that there was not a total breakdown in communication preventing an adequate defense is not entitled to clear error review. See Smith, 640 F.3d at 590. Even if we were to review this finding for clear error, however, this factor likewise weighs against the district court's ruling.

Firstly, a conflict of interest emerged once Attorney Allen failed to timely renew the motion to appoint Dr. Plaud before the discovery deadline passed. We find useful the Supreme Court's decision in Maples v. Thomas, in which a post-conviction petitioner's attorneys abandoned their representation of him and missed a critical deadline, thereby causing a procedural default of the petitioner's claims. 132 S.Ct. 912, 916-25 (2012). While dicta, the Supreme Court found in Maples that "a significant conflict of interest arose for the firm once the crucial deadline passed" because "the firm's interest in

15

avoiding damage to its own reputation was at odds with [the client's] strongest argument" for excusing the procedural default.  Id. at 925 n.8.

In this case, we need not decide whether Attorney Allen actually abandoned Blackledge as in Maples because a conflict arose from the fact that the alleged abandonment was Blackledge's strongest argument for excusing the untimeliness of the renewed motion.  Indeed, we recently recognized in the context of federal habeas proceedings that "a clear conflict of interest exists in requiring . . . counsel to identify and investigate potential errors that they themselves may have made . . . ."  Gray v. Davis, 526 F. App'x 331, 334 (4th Cir. 2013).  This conflict exists irrespective of whether the attorney is ultimately found to have erred.  See id. at 334-35.  Likewise, a conflict existed here, because, in order to argue that the lateness of the renewed motion should be excused, Attorney Allen would have had to assert her own ineffectiveness.  This conflict further undermined Blackledge's trust in Attorney Allen and strained their ability to communicate.[5]

---

[5] As our dissenting colleague points out, the magistrate judge asked Blackledge whether his dissatisfaction was largely because of the court's rulings denying Dr. Plaud's appointment, to which Blackledge replied that he had been "laboring under the assumption" that Attorney Allen was in the process of obtaining an expert until he learned that the request was "precluded by the Court."  J.A. 107.  Although the dissent cites this exchange (Continued)

16

Secondly, in her second motion to withdraw, Attorney Allen explained that Blackledge had recently "indicated that he intends to file a complaint with the North Carolina State Bar against counsel because of her failure to obtain an expert in his case, unless she removes herself from his case." J.A. 120. As in Maples, this threat and the subsequent filing of a bar complaint against Attorney Allen for her conduct thus put her own professional interests directly at odds with those of her client's interests. Certainly, not every bar complaint against an attorney by her client will result in a conflict of interest, and we have previously expressed our unwillingness to "invite [those] anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial." United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993). However, in this case, Blackledge threatened and ultimately submitted a seemingly non-frivolous grievance against Attorney Allen that forced her to choose between protecting her own reputation and arguing in her client's best interest that

---

in order to suggest that Blackledge's conflict with his lawyer was really only a grievance with the court's rulings, Blackledge's response actually demonstrates that Attorney Allen had failed to effectively communicate with him regarding her efforts to have Dr. Plaud appointed, thereby leaving him with the false assumption that the process was underway.

17

Blackledge should not be made to bear the consequence of her own errors in submitting the renewed motion to appoint Dr. Plaud.

Thirdly, Attorney Allen also asserted an internal ethical conflict, and because the district court failed to conduct an adequate inquiry, it is unclear if this conflict was ever resolved prior to trial. Moreover, the district court made no inquiry whatsoever into the scope and nature of this conflict. As a result, we have no way of knowing whether Attorney Allen's internal ethical conflict was indeed so significant that it required her withdrawal as counsel. The fact that she told the magistrate judge that she would represent Blackledge zealously "with great difficulty" if the motion were denied, J.A. 101, is of little help, because, having been made aware of its existence, the court had a sua sponte obligation to examine the extent of this conflict. See Mickens v. Taylor, 240 F.3d 348, 357-58 (4th Cir. 2001) ("[A] trial court must inquire into a conflict of interest 'when it knows or reasonably should know that a particular conflict exists.'") (quoting Cuyler v. Sullivan, 446 U.S. 335, 347 (1980)). Indeed, to the extent that Attorney Allen did opine that she could continue to represent Blackledge, this assertion cannot be isolated from her repeated protestations that she could not do so ethically.

Notwithstanding this lack of clarity as to the extent of the internal ethical conflict, Attorney Allen's delay in

18

renewing the motion to appoint Dr. Plaud and the bar complaint against her, taken together, created a conflict of interest. As such, we must consider whether the conflict resulted in a total breakdown in communications preventing an adequate defense. "A total lack of communication is not required," Johnson, 114 F.3d at 443 (emphasis added), but rather our concern is with "a 'breakdown' of attorney-client communication so great that the principal purpose of the appointment — the mounting of an adequate defense incident to a fair trial — has been frustrated." Smith, 640 F.3d at 588.

The most telling evidence of the extent of the breakdown and its impact on Blackledge's defense is the assertion from Attorney Allen and Blackledge on the morning of the trial that they failed to engage in trial preparation or discuss whether Blackledge would testify. The dissent overstates the extent to which Attorney Allen conferred with Blackledge about whether he would testify, as she declined the court's offer to take a recess in order to do so, citing the fact that she had spoken with him "just briefly" in deciding not to present any witnesses or evidence. J.A. 233. In Jennette, we held that a court abused its discretion in denying a motion to substitute counsel prior to a sentencing hearing in light of the fact that both counsel and the defendant "stated that they had not had a chance to review the PSR together, and indeed had not really spoken

19

since the trial concluded, certainly a fundamental step for adequate representation at sentencing." 387 F. App'x at 307.

In this case, Attorney Allen labored under a conflict of interest that caused her communications with Blackledge to be so broken that a "fundamental step for adequate representation" — basic trial preparation — failed to occur. As we have previously noted, "it is the marriage of the attorney's legal knowledge and mature judgment with the defendant's factual knowledge that makes for an adequate defense." Smith, 640 F.3d at 588. In this case, because of the communications breakdown, Blackledge presented no evidence or testimony in proceedings that, like a sentencing hearing, often turn on mitigating evidence as to the respondent's continued dangerousness. This factor therefore weighs against the court's ruling.

Weighing all three Gallop factors, we hold that the district court abused its discretion. The second motion to withdraw was untimely, as the district court found. However, the motions do not appear to be a "transparent plot to bring about delay," and "we have never found [untimeliness] a bar when a substitution claim is otherwise meritorious." Smith, 640 F.3d at 596 (internal citations omitted). The district court failed to perform an adequate inquiry here, but the record before us nonetheless reveals that the above-discussed conflict resulted in a communications breakdown that prevented Attorney Allen and

20

Blackledge from mounting an adequate defense.   As such, the court abused its discretion in denying the motions to withdraw.

## C.

A district court's abuse of discretion in denying a motion to substitute counsel is subject to harmless error review. Horton, 693 F.3d at 467.  Although Horton does not explicitly prescribe how to proceed with this harmlessness analysis, we cited a Seventh Circuit case holding that a court's error in denying a motion for new counsel was harmless because the defendant had not shown that his counsel was constitutionally ineffective under the Sixth Amendment.   Id. (citing United States v. Wilks, 46 F.3d 640, 644 (7th Cir. 1995)).  Blackledge acknowledges that he does not have a right to effective assistance of counsel under the Sixth Amendment, and we need not and do not decide here whether he has an analogous right under the Due Process Clause.   However, even if we were to consider whether the court's error was harmless in light of our cases applying the Sixth Amendment right to effective assistance of counsel, it is evident that Blackledge was harmed by being forced to proceed with Attorney Allen as his counsel.

In Horton, we assumed without deciding that the district court abused its discretion since the court's failure to conduct any inquiry left us with an incomplete record upon which to determine the extent of the communications breakdown and whether

21

it prevented an adequate defense. 693 F.3d at 467. Still, we found that the error was harmless, noting that the defendant had not identified "any specific way in which his defense was hampered by any lack of communication with his counsel," and, indeed Horton later indicated that he had an ample opportunity to discuss his case with his lawyer, had done so, and was fully satisfied with his representation. 693 F.3d at 467. In Blackledge's case, however, his representation was undoubtedly hampered by his lack of communication with Attorney Allen since it prevented them from preparing for trial or discussing whether he would testify,[6] and neither Blackledge nor Attorney Allen indicated that their communications had improved. The fact that Attorney Allen cross-examined the Government's witnesses and moved for a directed verdict does not by itself mean that she was fulfilling her obligations as counsel, especially in light of her own vigorous claims that she would have great difficulty

---

[6] The dissent questions that Blackledge could have had any relevant testimony to offer on the ground that "resolution of th[e] [volitional impairment] element depended on expert testimony, not on Blackledge's testimony." Dissenting Op., at 36 (emphasis in original). However, as we have recently explained, a respondent's own testimony and the testimony of those who have had sustained contact with him during his incarceration may indeed be significant to the evaluation of this element. See Antone, 742 F.3d at 165-66. Further, in making this predictive judgment about Blackledge's ability to control his urges, the district court evidently did not find his testimony to be as irrelevant as the dissent supposes since it received his deposition testimony into evidence. J.A. 166.

22

zealously representing Blackledge. See Smith, 640 F.3d at 589 ("Where a defendant's communication with an appointed attorney has so frayed that a court determines the mounting of an adequate defense to be impossible, the defendant is neither 'be[ing] heard by counsel' nor receiving 'the Assistance of Counsel for his defence.'") (alteration in original).

Further, we rejected the argument that the denial of a motion to substitute counsel was harmless in Jennette, where defense counsel failed to go over the PSR with his client prior to the sentencing hearing, despite the fact that the court actually reviewed the PSR with the defendant in open court. 387 F. App'x at 307-08. "Although laudable," we noted that "going over the PSR with the district judge in open court can hardly be said to substitute for a private, attorney-client-privileged conversation with counsel before sentencing even begins." Id. at 308. Even if such an action could have rendered the court's abuse of discretion harmless in Jennette, there was no such attempt to cure the deficiencies in Blackledge's representation caused by the breakdown in communications, nor could there have been here other than to allow conflict-free counsel to take Attorney Allen's place.[7]

---

[7] Notably, while Attorney Allen had co-counsel, Attorney Allen was the lead attorney and she alone represented Blackledge at the trial on his commitment.

23

In total, in proceedings that could result in lifelong incarceration for a person who has already served his full sentence, Blackledge was forced to be represented by a lawyer asserting multiple conflicts of interest with whom he had not prepared for trial because of their inability to communicate. We cannot conclude that the court's abuse of discretion in requiring Attorney Allen to continue as counsel was harmless. We therefore vacate the court's judgment as to the motions to withdraw and remand for the court to reconsider these motions after engaging in the appropriate inquiry regarding the extent of Attorney Allen's conflicts.

IV.

For the foregoing reasons, we vacate the district court's judgment denying the motions to withdraw and remand for further proceedings consistent with this opinion. In light of this ruling, we need not consider at this time Blackledge's remaining arguments regarding the motions to reopen and extend discovery and to appoint Dr. Plaud.

VACATED AND REMANDED

24

SHEDD, Circuit Judge, dissenting:

If the record supported the majority's narrative that the district court failed to investigate Attorney Sonya Allen's asserted conflicts of interest and forced Blackledge to participate in the civil commitment hearing without meaningful assistance of counsel, I would join the decision to vacate the judgment. However, the record establishes quite the contrary.

During two separate hearings, the magistrate judge and the district judge thoroughly considered Attorney Allen's motions to withdraw as counsel, both of which were untimely, and gave Blackledge and Attorney Allen ample opportunity to address the purported conflicts. After personally observing their in-court interaction, the magistrate judge found that Blackledge and Attorney Allen were able to communicate adequately in his defense; that finding – which was reviewed by the district judge – is not clearly erroneous. Moreover, the district judge explained why the purported conflicts did not prevent Attorney Allen from representing Blackledge, and both judges recognized the prejudicial impact that granting the withdrawal motions would have on the government and the administration of justice. Further, Attorney Allen fully represented Blackledge at the commitment hearing, filing a prehearing brief, cross-examining witnesses, conferring with him about whether he would testify or present evidence, and making a closing argument.

25

Simply put, the district court did not abuse its discretion in denying the withdrawal motions. Because the court committed no discernible error, I dissent from the majority's decision to vacate the judgment.

I

I begin with an overview of pertinent aspects of the Adam Walsh Child Protection and Safety Act, 18 U.S.C. § 4248. Enacted in 2006, the Act is "a modest addition to a set of federal prison-related mental-health statutes that have existed for many decades,"[1] but it "differs from earlier statutes in that it focuses directly upon persons who, due to a mental illness, are sexually dangerous." United States v. Comstock, 560 U.S. 126, 137, 141 (2010). The purpose of the Act is "to protect the public from the dangers posed by releasing sexually dangerous persons from federal custody," United States v. Broncheau, 645 F.3d 676, 683 (4th Cir. 2011), and if the district court "finds by clear and convincing evidence that the person is a sexually dangerous person, the court <u>shall</u> commit the person to the custody of the Attorney General," 18 U.S.C. § 4248(d) (emphasis added).

A § 4248 hearing is "civil in nature," and "the constitutional rights to which a defendant in a criminal trial

---

[1] <u>See</u> 18 U.S.C. §§ 4241-4246.

26

is entitled do not adhere to [the] respondent in [the] commitment hearing." United States v. Wood, 741 F.3d 417, 423 (4th Cir. 2013) (citation and internal quotation marks omitted). Moreover, "[a]s compared to the goal of a criminal trial, the goal of a commitment hearing is far different." United States v. Baker, 45 F.3d 837, 844 (4th Cir. 1995). The "basic issue" in a criminal case "is a straightforward factual question — did the accused commit the act alleged?" Addington v. Texas, 441 U.S. 418, 429 (1979). A criminal trial serves "to uncover the truth by examining rigorously the reliability of conflicting evidence presented and then engaging in extensive factfinding," and the "rights of cross-examination and confrontation, as well as the right to effective assistance of counsel, are all directed toward this goal." Baker, 45 F.3d at 844. In contrast, the primary inquiry in a commitment hearing "involves a question that is essentially medical," Vitek v. Jones, 445 U.S. 480, 495 (1980), and it is based primarily upon the theoretical opinions of experts, Baker, 45 F.3d at 845. "The aim of cross-examination is changed accordingly: its goal is not to 'poke holes' in the testimony of a witness, but to test the expert opinion given and determine its basis and its limits." Id.

When the government initiates a § 4248 civil commitment proceeding, the district court "may order that a psychiatric or psychological examination of the defendant be conducted, and

27

that a psychiatric or psychological report be filed with the court pursuant to the provisions of [18 U.S.C. §§] 4247(b) and (c)." 18 U.S.C. § 4248(b). If the court finds more than one examiner "appropriate," it may appoint additional examiners. 18 U.S.C. § 4247(b). Each examiner is designated by the court, except "upon the request of the defendant an additional examiner may be selected by the defendant." Id. Regardless of whether the defendant selects the examiner, however, the § 4247(b) examiner serves as an "officer of the court, not responsible to prosecution or defense," In re Harmon, 425 F.2d 916, 918 (1st Cir. 1970), and must file his report with the court and provide copies to government and defense counsel, 18 U.S.C. § 4247(c).[2]

At the commitment hearing, the defendant "shall be represented by counsel and, if he is financially unable to obtain adequate representation, counsel shall be appointed for him pursuant to § 3006A." 18 U.S.C. § 4247(d). Additionally, the defendant "shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to

---

[2] A § 4247(b) examiner differs from an expert authorized under 18 U.S.C. § 3006A. As one court has recognized, an examination conducted by an order of the court "is conducted to serve the court in a completely nonpartisan manner. . . . The expert appointed under § 3006A, however, is not originally and primarily an aide to the court, but rather is intended to serve the interests of the defendant." United States v. Chavis, 476 F.2d 1137, 1141-1142 (D.C. Cir. 1973); see also United States v. Reason, 549 F.2d 309, 311 (4th Cir. 1977); United States v. Taylor, 437 F.2d 371, 377 (4th Cir. 1971).

28

confront and cross-examine witnesses who appear at the hearing." Id.

To civilly commit an individual under § 4248, the government must prove by clear and convincing evidence that the person: (1) engaged in or attempted to engage in sexually violent conduct or child molestation (the "prior conduct element"); (2) suffers from a serious mental illness, abnormality, or disorder (the "mental illness element"); and (3) because of the serious mental illness, abnormality, or disorder, would have serious difficulty in refraining from sexually violent conduct or child molestation if released (the "serious difficulty element"). United States v. Francis, 686 F.3d 265, 274 (4th Cir. 2012).

When a district court determines (as a preliminary factual matter) that the government has proven the "prior conduct" element, it must then consider the "mental illness" and "serious difficulty" elements. These latter two elements "ensure that commitment is limited to inmates with a volitional impairment — inmates whose mental illness renders them dangerous beyond their control." United States v. Wooden, 693 F.3d 440, 442 (4th Cir. 2012) (citation and internal quotation marks omitted). Therefore, the court must evaluate "the individual's present mental condition and the likely prospective effect of that mental condition on his volitional control;" this evaluation

29

depends "on the significance of the factual information as viewed by the expert psychiatrists and psychologists." Francis, 686 F.3d at 275. Compared to the first two elements, the "serious difficulty" element is "more complicated" because "it requires the court to issue a predictive judgment: has the Government met its burden by presenting clear and convincing evidence that, in the uncertain future, the respondent will have serious difficulty in refraining from sexually violent conduct or child molestation?" United States v. Antone, 742 F.3d 151, 159 (4th Cir. 2014) (internal quotation marks and citation omitted).

## II

With this backdrop in mind, I now turn to the pertinent facts. In my view, proper evaluation of the decision to deny the withdrawal motions requires a complete understanding of the facts of this case, but many critical facts are not acknowledged by the majority, and these facts tend to fatally undermine the majority's decision.

## A.

Blackledge has a substantial criminal history, which spans 45 years and includes a conviction for first degree murder, multiple convictions for producing and mailing child pornography, a conviction for sexual exploitation of a minor, and a probation violation for possessing child pornography.

Based on this record, the government filed a "Certificate of Sexually Dangerous Person" against Blackledge in September 2009. In June 2010, the district court appointed the Federal Public Defender's Office ("FPDO") to represent Blackledge. Shortly thereafter, Blackledge moved to dismiss the case. The court denied that motion in January 2011. Initially, other FPDO attorneys represented Blackledge, but in March 2011, FPDO Attorney Allen replaced those attorneys.

Attorney Allen actively represented Blackledge in pretrial matters. As one of her discovery efforts, she obtained the appointment of Dr. Terence Campbell to provide a forensic evaluation of Blackledge pursuant to § 4247(b). Unfortunately for Blackledge, Dr. Campbell concluded that Blackledge meets the sexual dangerousness criteria for civil commitment. Upon receiving Dr. Campbell's report, Attorney Allen attempted to have Dr. Joseph Plaud appointed as an additional forensic examiner, but the magistrate judge denied the motion without prejudice based on his finding that Blackledge had failed to establish a need for an additional court-appointed examiner. Blackledge did not appeal this order to the district judge. The deadline for discovery was December 22, 2011.

On March 28, 2012, the district judge scheduled the commitment hearing for June 14. On April 17, FPDO Attorneys Katherine Shea and Debra Graves formally joined the case to

31

represent Blackledge along with Attorney Allen. One month later, on May 16, Blackledge moved to reschedule the June 14 hearing based specifically, and only, on the fact that Attorneys Shea and Graves were unavailable because of prior commitments. The district judge granted this motion and rescheduled the trial for August 2.

On June 14, Blackledge filed a "renewed motion" to have Dr. Plaud appointed, to reopen discovery, and to reschedule the August 2 commitment hearing. Blackledge asserted that "securing an expert to testify favorably . . . is of paramount importance to putting on an adequate defense." J.A. 306. Opposing this motion, the government argued that Blackledge "has not shown a need for a second additional examiner, aside from the stated desire to secure an expert to testify favorably [for him]. Such a purpose falls outside the statutory provisions governing court-appointed examiners in this proceeding." J.A. 77. In a subsequent reply memorandum supporting the motion, Blackledge asserted that this is a "battle-of-the-experts case" and that his ability to defend himself would be prejudiced without a favorable expert. J.A. 310.

The magistrate judge denied this motion on July 2, finding that it was untimely and that Blackledge failed to show that appointment of Dr. Plaud was necessary. The magistrate judge explained that Blackledge made "no representation that Dr. Plaud

32

has reached a preliminary opinion that [he] does not qualify as a sexually dangerous person or that the other evaluations under § 4248 are somehow flawed based on a review of the records without a clinical interview. Such a record review [by Dr. Plaud] would not require court approval." J.A. 314-15. Blackledge did not appeal this order to the district judge.

On July 10, just over three weeks before the scheduled trial date, Attorney Allen moved for an order allowing her and the entire FPDO to withdraw. In the motion, Attorney Allen asserted without further explanation that "an internal conflict has arisen and the undersigned can no longer ethically continue to represent" Blackledge. J.A. 80. After the government filed a memorandum opposing this motion, Attorney Allen filed a reply memorandum, in which she stated: "To clarify the position of Respondent, Mr. Blackledge personally wishes to proceed in this matter with new counsel." J.A. 86. Apart from this statement, Attorney Allen offered no further explanation for the motion, but she did ask for a hearing if the court desired additional information.

On July 17, Attorney Graves filed a notice that she had withdrawn from the case. The notice contains no explanation for her withdrawal.

33

On July 18, the magistrate judge held a hearing on the withdrawal motion. The hearing lasted almost one hour, and Attorneys Allen, Graves, and Shea appeared on behalf of Blackledge. See J.A. 89. The magistrate judge began by confirming that Blackledge joined in the motion and was seeking new counsel. The magistrate judge then asked Attorney Allen to explain the "internal conflict" underlying the motion. Attorney Allen responded that "there are some things that [Blackledge] wants to see that I am not going to be able to help him with and because of that there's a conflict that we just will not be able to resolve." J.A. 91.

After Attorney Allen spoke, the magistrate judge placed Blackledge under oath and asked him to explain his concerns. Blackledge stated that he had trouble getting documents from his attorneys and that he had "no confidence, or little confidence left in, that they can provide the kind of defense I need." J.A. 93. The magistrate judge asked Blackledge to elaborate on that point, and Blackledge responded that it was "the fact that, just in getting documents and so forth from home. You ask for a copy and you never get any." Id. When the magistrate judge asked what documents Blackledge wanted, he responded that "it's very difficult to reveal what it is without showing my hand." J.A. 95. At this point, the magistrate judge paused the hearing in

34

order to allow Attorney Allen and Blackledge to confer. Id. When the hearing continued, Blackledge stated that although he initially could communicate with Attorney Allen, the relationship had become "strained," and it was "very difficult . . . to talk to someone . . . you've lost confidence in. It's difficult to share, . . . if you think it's going to be ignored, or you're given short shrift." J.A. 96. In response to the magistrate judge's question, Blackledge stated that his attorney communication problems began "over six months ago." Id. When asked why he did not raise the matter sooner, Blackledge admitted that he "let things go and I think I let them go too long in this case." J.A. 97.

At this point, the magistrate judge asked Attorney Allen about possible replacement counsel. Attorney Allen stated that she understood a private attorney would accept the case, but that the attorney would not be prepared to go forward with the August 2 hearing. The magistrate judge then paused the hearing in order to permit Attorney Shea to confer with Blackledge. J.A. 99. When the hearing resumed, Attorney Allen stated that she understood why Blackledge had lost confidence in her, but she acknowledged that she could represent him "with great difficulty." J.A. 101. The magistrate judge then spent some time explaining to Blackledge the role of a lawyer, after which the government attorney briefly stated the government's position.

35

Following the government's statement, Blackledge expressed his concern that he did not have an adequate defense because he did not have an expert witness who would testify on his behalf at the hearing. Blackledge also alluded to "other matters" but stated that he could not discuss them "because they are a part of my defense that were mishandled." J.A. 106. Blackledge then stated that all he wanted was "a level playing field and a fair shake and I don't think I'm getting it the way things are now." Id. The magistrate judge observed that Blackledge's complaint was really about the orders denying Dr. Plaud's appointment, to which Blackledge responded that he had been "laboring under the assumption" that Attorney Allen had procured a new expert examiner for him, only to find out that another expert had been "precluded by the Court." J.A. 107. The magistrate judge explained that there was no basis under the circumstances for Blackledge to have another court-appointed examiner.

In response, Attorney Graves (who had previously withdrawn from the case) stated that Dr. Plaud had given "a preliminary determination . . . that he could potentially clear" Blackledge for commitment. Id. Attorney Allen then admitted that she had neglected to move for another expert to be appointed in a timely manner, and she noted that this was "another conflict" and "one of the reasons" for the withdrawal motion. J.A. 108. Attorney Allen also stated that "[w]ith no expert, there's very little

36

reason for [Blackledge] to have a trial and he understands that." J.A. 109. Finally, she acknowledged that Dr. Plaud was not "totally committed" to finding in Blackledge's favor but was "willing to look at it." Id.

The magistrate judge raised the possibility of conducting an ex parte hearing with Blackledge and Attorney Allen. J.A. 111. However, the magistrate judge asked Blackledge if he had anything further to add regarding his relationship with Attorney Allen, and Blackledge responded that he had adequately conveyed his position. Id. With that concession, the magistrate judge then announced his ruling from the bench.

Denying the motion, the magistrate judge first found that it was untimely. As the magistrate judge explained: "Mr. Blackledge . . . states that he's had concerns about his counsel going back for months and yet this motion is filed in a matter of weeks before the hearing in this case." J.A. 113. The magistrate judge then noted the difficulties involved in scheduling commitment hearings and that a continuance would be necessary if the motion was granted. Finally, the magistrate judge stated that after considering the information presented, he had a "full picture of the nature of the problem" between Attorney Allen and Blackledge, and he did not believe that there was a breakdown in communication that would prevent an adequate defense. J.A. 114. In support of this point, the magistrate

37

judge pointed out that Blackledge and Attorney Allen conferred "at Mr. Blackledge's initiation in court today." Id.

C.

On July 23, Attorney Allen filed an appeal of the magistrate judge's order denying the withdrawal motion. As grounds for the appeal, Attorney Allen stated that the magistrate judge's order is "contrary to law," J.A. 119, specifically Maples v. Thomas, 132 S.Ct. 912 (2012).[3] Although Blackledge had not cited or argued Maples to the magistrate judge, Attorney Allen argued that Maples stands for the proposition "that if court-appointed counsel in a civil habeas case misses an important deadline, that counsel thereafter has an irreparable conflict." J.A. 119. Attorney Allen also stated that she had met with Blackledge, and he informed her that he "intend[ed] to file a complaint with the North Carolina State Bar against counsel because of her failure to obtain an expert in his case, unless she removes herself from his case." J.A. 120. Attorney Allen acknowledged that allowing her to withdraw would disrupt the hearing schedule and cause the government

---

[3] In Maples, counsel appointed to represent a state habeas petitioner abandoned the case without notice, thereby causing the petitioner to miss a filing deadline. Because the petitioner missed the deadline, his federal habeas claim was dismissed on grounds of procedural default. The Supreme Court held that the attorneys' abandonment of the petitioner constituted sufficient cause to excuse the default.

38

"expense and inconvenience," but she maintained that the government's interests "cannot trump [Blackledge's] right to effective counsel." Id.

The following day, Attorney Shea filed a notice that she had withdrawn from the case. As with Attorney Graves, the notice contains no explanation for Attorney Shea's withdrawal.

On July 26, Blackledge sent a handwritten letter to the district court stating that he had "written the bar association to dismiss the team of Shea, Graves, and Allen" and that he was "serious about wanting new blood and attentiveness to [his] defence [sic]." J.A. 129 (emphasis in original). Blackledge did not include a copy of his bar complaint with the letter, and he provided no further explanation about it.

That same day, Attorney Allen filed Blackledge's proposed findings of fact and conclusions of law. Evidently, she had discussed some aspects of the case with Blackledge because she foreshadowed his expected hearing testimony, stating (in predictive form) that he "denied possession and use of any drugs while incarcerated" and testified "with regard to the sex offender treatment and drug treatment he received in the past and his prior convictions for sexual conduct," "about his conduct while incarcerated," and "that he has received no infractions of any nature, sexual or otherwise" during his time at FCI-Butner. Respondent's Proposed Findings of Fact and

Conclusions of Law, No. 5:09-HC-2118-D-JG (E.D.N.C. July 26, 2012) (pages 14-15).

On July 30, Attorney Allen filed a "second motion" to withdraw as counsel. In this motion, she referenced Blackledge's complaint with the state bar and stated that she believed she could no longer represent him.

On July 31, the parties' Second Amended Joint Proposed Pre-Trial Order was filed. Attorney Allen signed the document on Blackledge's behalf. In this document, Blackledge stipulated that "he has engaged in or attempted to engage in sexually violent conduct or child molestation" and that "he suffers from a serious mental illness, abnormality or disorder, specifically pedophilia." J.A. 137. Based on these stipulations regarding the "prior conduct" and "mental illness" elements, Blackledge agreed there was only one issue to be decided at the commitment hearing: i.e., whether he would "have serious difficulty in refraining from sexually violent conduct or child molestation if released." J.A. 138. Among other things, the government listed Blackledge as a potential witness, and it also designated his deposition transcript as potential discovery material to be used at the hearing.

D.

On August 2, the parties appeared before the district judge for the commitment hearing. As the hearing began, Attorney Allen

40

asked the district judge to consider the withdrawal issue. The district judge responded that he had "read everything" and was prepared to "listen to anything you would like to add." J.A. 148.

Attorney Allen stated that she had a conflict that could not be resolved and that Blackledge "feels he cannot get proper representation if [she] were to continue, and our relationship has deteriorated to a point that we cannot discuss his case, strategies of his case. We cannot effectively communicate." J.A. 148-49. The district judge then asked Attorney Allen how her ability to cross-examine the expert witnesses would be impacted by her relationship with Blackledge. Without specifically answering this question, Attorney Allen referred to the state bar complaint, which she admitted she had not seen, and asserted that "it has certainly affected my ability to feel as if I can do everything in this case that is needed because I can't even effectively communicate with my client." J.A. 149-50.

The district judge noted that the case had been pending for a considerable period and that he was "very familiar with the record." J.A. 150. Continuing, the district judge stated: "I have listened to the hearing that [the magistrate judge] had on the original motion to withdraw and I understand all the issues associated with Dr. Plaud and the scheduling order." Id. The district judge observed that because of Blackledge's

41

stipulations, the case essentially boiled down to "an evaluation fundamentally of the experts and their persuasiveness," id., and he pointed out (based on his prior case experience) that because the government bore the burden of proof, Blackledge could potentially prevail without an expert witness. The district judge asked Attorney Allen if she had anything else to add to the motion. She responded that she had not been able to "appropriately" address with Blackledge the issue of whether he should testify. J.A. 151.

At the district judge's invitation to speak, Blackledge stated that he was "being given a short shrift" and that the "playing field is not level." Id. Blackledge also complained generally about Attorney Allen's alleged failure on his behalf during discovery. Responding to a question from the district judge, Blackledge stated that, if pushed to the choice, he would rather be represented by Attorney Allen than proceed pro se.

In denying the motions, the district judge began with a thorough recitation of the history of the case. See J.A. 151-57. The district judge specifically detailed the hearing before the magistrate judge and the bases for the magistrate judge's order denying the first withdrawal motion. The district judge stated that he had reviewed the magistrate judge's order de novo and had fully considered the second withdrawal motion.

42

The district judge found that the motions were untimely and "[a]ny further delay would substantially prejudice the government and . . . the public interest." J.A. 159. The district judge explained that the trial dockets for the next several months were full, indicating that the delay caused by granting the motions would be lengthy.

The district judge then found that a thorough inquiry had been made into the issues. As the district judge explained, the magistrate judge "thoroughly engaged in an inquiry with Mr. Blackledge and Ms. Allen and the government," and "[t]he issues associated with Dr. Plaud have been exhaustively examined." J.A. 160.

The district judge further found that there was not a breakdown between Attorney Allen and Blackledge that would prevent an adequate defense. The district judge noted that the government bore the burden of proof at the commitment hearing, and Attorney Allen was prepared to cross-examine the expert witnesses. Moreover, the district judge pointed out that the government "ha[d] the ability to call Mr. Blackledge as a witness and had planned to . . . for some time." J.A. 161. The district judge also explained that Maples was inapplicable because Attorney Allen had not abandoned Blackledge. Finally, the district judge observed that he had "looked into this whole issue of a bar disciplinary grievance" – which was "an undefined

43

grievance but apparently just a dissatisfaction with how the case came out." Id. The district judge explained that the bar complaint did not create a per se conflict, and neither Blackledge nor Attorney Allen had presented any specific evidence to establish a conflict arising from the complaint.

After the district judge ruled on the withdrawal motions, Attorney Allen moved to bifurcate the commitment hearing to allow Blackledge the "opportunity to be examined by Dr. Plaud" and "an opportunity to possibly present a defense in the future." J.A. 162. The government opposed the motion, and the district judge denied it, explaining that "there's been no evidence that I have seen that [Dr. Plaud] would actually reach a different conclusion, other than apparently just perhaps the belief, to my knowledge, that he's never found anyone in a 4248 case tried in the Eastern District of North Carolina subject to civil commitment." J.A. 163. The district judge also noted that the motion was "inconsistent with the scheduling order and the public interest." J.A. 163-64.

Thereafter, the commitment hearing proceeded on the merits. During the hearing, two expert witnesses – Dr. Christopher North and Dr. Terence Campbell – testified, and the forensic report of a third expert witness – Dr. Tonya Cunic – was admitted into evidence. Additionally, in lieu of calling Blackledge to the stand to testify, the government submitted his deposition.

Receiving the deposition into evidence, the district judge noted that "to the extent there was an issue associated with trial preparation, I know that Mr. Blackledge appeared at that deposition with counsel and was prepared for that deposition by counsel." J.A. 166. The district judge stated that this fact "further mitigates issues associated with any prejudice on the motion to withdraw." Id.

Attorney Allen vigorously represented Blackledge. Among other things, she cross-examined Drs. North and Campbell, see J.A. 197-204, 220-33; conferred with Blackledge about whether he was going to testify, see J.A. 233; unsuccessfully moved for judgment as a matter of law, see J.A. 234; and presented a closing argument, see J.A. 241-45. Ultimately, the district judge found that Blackledge meets the § 4248 commitment criteria. The district judge explained its reasoning in detail, see J.A. 247-86, noting (among other things) that he read Blackledge's deposition testimony as part of his consideration of the evidence, see J.A. 261-62.

### III

On appeal, Blackledge does not challenge the district court's finding that he meets the § 4248 criteria. Instead, he bases his arguments on the court's denial of Attorney Allen's withdrawal motions and his requests for the appointment of Dr. Plaud as an additional examiner. Specifically, he contends: (1)

45

based on Maples, the court clearly erred in finding that Attorney Allen had not abandoned him; (2) because Attorney Allen abandoned him, the court abused its discretion by failing to equitably toll the discovery deadline to allow him to seek the appointment of Dr. Plaud;[4] (3) the court abused its discretion by failing to allow Attorney Allen to withdraw based on her conflict of interest; and (4) the court used an erroneous standard and, therefore, abused its discretion by refusing to grant his motion to appoint Dr. Plaud.

The majority grounds its decision to vacate the judgment only on the third issue, finding that the district court abused its discretion in denying the withdrawal motions. Before I address that issue, I believe that it is necessary to address the issues involving Dr. Plaud, which appear to be the genesis of Blackledge's dissatisfaction with the proceedings below. As noted, Blackledge and Attorney Allen have argued throughout the case that he cannot avoid civil commitment without an expert testifying in his favor. See, e.g., J.A. 109 (Attorney Allen

---

[4] I would hold that the district judge correctly found that Attorney Allen did not abandon Blackledge. Attorney Allen's representation of Blackledge is in no sense comparable to the attorneys' conduct in Maples. In any event, I would also hold that the alleged abandonment did not prejudice Blackledge because the magistrate judge denied the second motion for the appointment of Dr. Plaud for two reasons, one of which was Blackledge's failure to demonstrate a need for the appointment. That reason is independent of the question of the timeliness of the motion, and it therefore moots the abandonment issue.

stating that "[w]ith no expert, there's very little reason for [Blackledge] to have a trial and he understands that"). Blackledge emphasizes this point most succinctly in his appellate brief:

> Blackledge had no experts to help him . . . and it seems highly probable that had he testified, his testimony would have failed to persuade the district court judge that he could refrain from further acts of sexual violence or child molestation. . . . <u>In essence, the district court completely denied Blackledge a defense when it refused to allow him the opportunity to pursue an additional expert forensic examiner</u>.

<u>Opening Brief of Appellant</u>, at 34 (emphasis added). Given Blackledge's view, I suspect that on remand this issue will almost certainly come up again.

In considering this issue, it is important to recall that the district court granted Blackledge his § 4247(b) right to select an examiner. Faced with an unfavorable diagnosis by his chosen examiner, Blackledge sought to have Dr. Plaud appointed in the hope that he would render a more favorable diagnosis. Although Blackledge's desire to have an examiner testify favorably for him is understandable, nothing in § 4247(b) suggests that he is entitled to select multiple court-appointed examiners or, for that matter, to select an examiner who will testify on his behalf. <u>See generally</u> <u>Wilson v. Greene</u>, 155 F.3d 396, 401 (4th Cir. 1998) (noting that due process "reflects primarily a concern with ensuring a defendant <u>access</u> to a

47

psychiatrist or psychologist, not with guaranteeing a particular substantive result" (emphasis in original)).[5] Moreover, as the magistrate judge and the district judge observed, Blackledge has never presented any reason to suggest that Dr. Plaud will render a favorable diagnosis. See generally Taylor, 437 F.2d at 376 ("Where an examination has been conducted so recently as to furnish a basis for a determination of present competence, there is ordinarily no reason to order another.").

Although I believe that Blackledge's appellate arguments regarding Dr. Plaud likely fail on the merits, we need not reach them. Both of Blackledge's motions seeking the appointment of Dr. Plaud were nondispositive, and they were referred to the magistrate judge. Following the denial of the motions, Blackledge did not appeal either magistrate judge order to the district judge.

Rule 72(a) of the Federal Rules of Civil Procedure provides that a party may serve and file objections to a magistrate judge's order on a nondispositive matter within 14 days after being served with a copy, but the party "may not assign as error a defect in the order not timely objected to." By failing to

---

[5] Blackledge's position raises an obvious question: how many examiners must the court appoint? Apparently, he would answer that the court must appoint as many examiners as it takes until one will testify in his favor. Otherwise, without such testimony, any commitment hearing would be, in his view, unfair. The absurdity of this position is self-evident.

48

appeal the magistrate judge orders to the district judge, Blackledge has waived appellate review of the orders denying his motions to have Dr. Plaud appointed. See McDonald v. City of Saint Paul, 679 F.3d 698, 709 (8th Cir. 2012).[6]

IV

I now turn to the withdrawal issues. In deciding whether to permit court-appointed counsel to withdraw, or to substitute court-appointed counsel on the defendant's request, the district court must be guided by the "interests of justice." See 18 U.S.C. § 3006A(c); Martel v. Clair, 132 S.Ct. 1276, 1285 (2012); see also United States v. Perez, 661 F.3d 189, 191 (4th Cir. 2011) (using a "good cause" standard). This is a "peculiarly context-specific inquiry" that is "so fact-specific [that] it deserves deference." Martel, 132 S.Ct. at 1287. We must accept the court's factual findings unless they are clearly erroneous, see United States v. Keita, 742 F.3d 184, 188 (4th Cir. 2014), and we may overturn a denial of a withdrawal motion only for an abuse of discretion, Martel, 132 S.Ct. at 1287, bearing in mind that "[t]he district court is far better situated than we are to observe and inquire into the state of the relationship between a

---

[6] Attorney Allen asked the district judge to bifurcate the commitment hearing and asserted that bifurcation would allow Dr. Plaud the opportunity to examine Blackledge. However, that request was not an appeal of the magistrate judge's orders, and it did not place the issue of whether Dr. Plaud should have been appointed before the district judge.

defendant and his appointed counsel," United States v. Smith, 640 F.3d 580, 590 (4th Cir. 2011), and that the court has "wide latitude" in limiting a defendant's right to counsel of choice based upon fairness and the demands of the court's calendar, United States v. Gonzalez-Lopez, 548 U.S. 140, 152 (2006).

As with any abuse-of-discretion review, we are obligated to exercise a "healthy measure of judicial restraint," Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 323 (4th Cir. 2008), reserving our power to correct only those district court decisions that "stray[] too far from the mark," id. at 322. Therefore, we may properly find abuse of discretion where the district court has acted arbitrarily or irrationally, failed to consider judicially recognized factors constraining its exercise of discretion, relied on erroneous factual or legal premises, or committed an error of law. United States v. Thompson-Riviere, 561 F.3d 345, 348 (4th Cir. 2009).

We have identified three relevant factors to consider in determining whether a district court abused its discretion in denying a withdrawal motion: (1) the timeliness of the motion, (2) the adequacy of the court's inquiry into the matter, and (3) whether the client and counsel experienced a total lack of communication preventing an adequate defense. United States v. Reevey, 364 F.3d 151, 156 (4th Cir. 2004). We weigh these

factors against the district court's interest in the orderly administration of justice. Id. at 157.

The majority holds that the district court abused its discretion in denying Attorney Allen's withdrawal motions. Applying the pertinent factors, the majority finds that the timeliness factor "weighs somewhat" in support of the district court's ruling, Majority Op., at 13, but it concludes that the other two factors do not. Specifically, the majority finds that "the district court did not meet its obligation to thoroughly inquire into the basis of the asserted conflict," id. at 14, and this "failure to probe deeply into the basis of Attorney Allen's conflict seriously undermines its decision," id. at 15. Further, the majority finds that "Attorney Allen labored under a conflict of interest that caused her communications with Blackledge to be so broken that a 'fundamental step for adequate representation' – basic trial preparation – failed to occur." Id. at 20. Explaining why the district court's purported error is not harmless, the majority states: "[I]n proceedings that could result in lifelong incarceration for a person who has already served his full sentence, Blackledge was forced to be represented by a lawyer asserting multiple conflicts of interest with whom he had not prepared for trial because of their inability to communicate." Id. at 24.

51

In my view, the record conclusively establishes that the district court did not abuse its discretion, much less err at all, in denying the withdrawal motions. Indeed, as I explain below, each of the relevant factors fully supports the district court's ruling. Moreover, Blackledge received a full and fair commitment hearing, and any purported defect in the district court's consideration of the withdrawal motions is harmless.

A.

First, the findings by the magistrate judge and the district judge that the motions were untimely are not clearly erroneous. By his own admission, Blackledge lost confidence in Attorney Allen no later than early 2012. In July, a mere three weeks before the August 2 commitment hearing, and after Blackledge had previously obtained a continuance of the commitment hearing,[7] the issue of Blackledge's purported dissatisfaction with Attorney Allen and her "internal conflict" finally came to light when she filed the first withdrawal motion. Despite the magistrate judge's specific inquiry, neither

_____

[7] In April 2012, Attorney Graves and Attorney Shea joined the case on Blackledge's behalf, giving him three FPDO attorneys of record. The following month Blackledge successfully obtained a continuance of the scheduled June 14 commitment hearing. Presumably, Attorney Graves and Attorney Shea were important to Blackledge's case because he used their inability to attend the June 14 hearing as justification to obtain the continuance. Despite this fact, he presented no reason why they could not represent him in lieu of Attorney Allen.

52

Blackledge nor Attorney Allen offered any real justification for the delay in bringing the matter to the district court's attention. Moreover, they did not challenge the magistrate judge's finding of untimeliness in the appeal of the magistrate judge's order to the district judge.[8]

## B.

Second, the district court's inquiry into the motions was more than adequate. Our caselaw illustrates that the district court conducts an adequate inquiry if it gives the defendant and counsel the opportunity to be heard regarding the nature of their relationship and the reason underlying the motion, considers what the attorney and defendant say in the context of the case as a whole, and explains the basis for its determination. See Perez, 661 F.3d at 192. We review the adequacy of the court's inquiry in its totality, and when the attorney-client issue has been raised at different stages of the litigation, the court need not revisit each aspect of the issue at every stage. See Smith, 640 F.3d at 594-95.

The magistrate judge, who had been very involved in the case, spent almost one hour hearing from Blackledge and Attorney Allen, and he afforded them every opportunity to present their

---

[8] The majority appears to agree that the second withdrawal motion, filed just days before the commitment hearing, was untimely. See Majority Op., at 12.

53

arguments. The magistrate judge specifically inquired about the purported internal ethical conflict, and he listened as Attorney Allen described it as arising from the fact that "there are some things that [Blackledge] wants to see that I am not going to be able to help him with." J.A. 91. The magistrate judge then listened as Blackledge expressed his general dissatisfaction with Attorney Allen and his defense, with the fact that she had not provided him with certain unspecified documents, and with the fact that he did not have another expert examiner. At the end of the hearing, the magistrate judge inquired and even offered to conduct an ex parte hearing, and Blackledge told him that he had nothing more to say on the matter.

When the district judge considered the appeal of the denial of the first motion, along with the second motion, he conducted a de novo review and similarly afforded Blackledge and Attorney Allen ample opportunity to argue their position.[9] The district judge stated that he was familiar with Blackledge's attempts to have Dr. Plaud appointed, was aware of Blackledge's bar

---

[9] The majority states that "the district court made no inquiry whatsoever into the scope and nature of" the "internal ethical conflict." Majority Op., at 18. This assertion ignores the magistrate judge's thorough inquiry and the district judge's subsequent review of that inquiry. Moreover, as is apparent from the record, the purported "ethical" conflict involved nothing more than Blackledge's general disgruntlement about Attorney Allen, his inability to see certain material, and his inability to obtain another court-appointed examiner.

54

complaint, had read all of the filed material, and had listened to the audio of the magistrate judge hearing. Both judges explained their rulings in great detail, illustrating their careful attention and consideration. There simply is no reasonable basis to condemn this inquiry as being inadequate.

C.

Finally, the findings by the magistrate judge and the district judge that there was not a total breakdown in communication that would prevent Blackledge from mounting an adequate defense are not clearly erroneous. The standard by which we must judge the denial of a withdrawal motion is objective, and it therefore does not depend solely on the defendant's dissatisfaction with his attorney's performance. United States v. Myers, 294 F.3d 203, 206 (1st Cir. 2002). As we have explained, the "breakdown" of communication between an attorney and the defendant must be "so great that the principal purpose of the appointment – the mounting of an adequate defense incident to a fair trial – has been frustrated." Smith, 640 F.3d at 588.

This standard requires us to consider whether the defendant has justifiable dissatisfaction with his appointed attorney, which includes a serious conflict of interest or an irreconcilable conflict. Id. at 588 n.4. However, justifiable dissatisfaction "is not established merely by a defendant's

55

frustration with counsel's performance or disagreement with his tactical decisions." United States v. Boone, 437 F.3d 829, 839 (8th Cir. 2006). Moreover, the district court is not always required to substitute counsel even where a real conflict exists. For example, the court may properly deny substitution "when the defendant's own behavior creates a conflict." United States v. Morsley, 64 F.3d 907, 918 (4th Cir. 1995); see also Smith, 640 F.3d at 591 (noting that a "defendant's obstinacy" cannot force the district court to substitute counsel).

The magistrate judge personally observed the in-court interaction between Blackledge and Attorney Allen during the hearing on the first withdrawal motions, and he expressly found (based on his observation) that they were able to communicate about the case in a manner that allowed Blackledge to conduct an adequate defense. This finding – based on the magistrate judge's direct observation - is not clearly erroneous.[10]

The district judge was aware of this finding, as well as the fact that Attorney Allen had communicated in some respects with Blackledge after the July 18 hearing and had filed pre-hearing documents on his behalf. Other than referring to the bar complaint and rehashing the same arguments they previously made,

---

[10] The record shows that the magistrate judge paused the July 18 hearing on two occasions in order to allow Blackledge to confer with Attorney Allen and Attorney Shea.

56

neither Blackledge nor Attorney Allen presented any additional information to establish that she could not adequately represent him.[11] Moreover, the district judge observed that, based on the parties' stipulations, the only issue to be litigated during the commitment hearing would be the "serious difficulty" element of the civil commitment analysis, and resolution of that element would boil down to the testimony and cross-examination of the expert witnesses. Of course, that is what Attorney Allen and Blackledge have repeatedly asserted during their attempt to have Dr. Plaud appointed. Notably, when asked by the district judge,

---

[11] The majority correctly states that "not every bar complaint against an attorney by her client will result in a conflict of interest." Majority Op., at 17. As we noted in United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993), "to hold otherwise . . . would invite criminal defendants anxious to rid themselves of unwanted lawyers to queue up at the doors of bar disciplinary committees on the eve of trial." Yet, the majority simply accepts the premise that Blackledge's bar complaint against Attorney Allen "forced her to choose between protecting her own reputation and arguing in her client's best interest that Blackledge should not be made to bear the consequence of her own errors in submitting the renewed motion to appoint Dr. Plaud." Majority Op., at 18. This assertion is not supported by the record, however, as Attorney Allen acknowledged on multiple occasions that she erred by not moving sooner for Dr. Plaud's appointment. For example, she told the magistrate judge at the July 18 hearing that she neglected to seek the appointment in a timely manner and that this was one reason that Blackledge wanted another attorney. See J.A. 108. Likewise, in the appeal of the magistrate judge's order denying the withdrawal motion, she cited Maples and implicitly admitted (albeit incorrectly) that she had abandoned Blackledge. See J.A. at 119. In short, there is no evidence to establish that Attorney Allen's ability to represent Blackledge was compromised by the bar complaint.

57

Attorney Allen could not explain how her ability to cross-examine the experts was impacted by her relationship with Blackledge.

                                    D.

The foregoing discussion amply illustrates that the district court did not abuse its discretion in denying the withdrawal motions.[12] Even assuming otherwise, however, the record makes it clear that the court's error is harmless.

In United States v. Horton, 693 F.3d 463 (4th Cir. 2012), the defendant filed a timely motion to substitute counsel, and the district court did not inquire into the reasons for the defendant's dissatisfaction with his attorney. We assumed, without deciding, that the court abused its discretion, but we nonetheless found the error harmless. As we noted, notwithstanding the defendant's dissatisfaction, the attorney provided an adequate defense: "For example, he filed pre-trial motions in limine, he cross-examined government witnesses, and he strongly advocated for his client throughout" the trial

---

[12] The pertinent factors strongly support the district court's ruling, and there is no reason to weigh them against the court's interest in the orderly administration of justice. However, for what it is worth, both the magistrate judge and the district judge explained that allowing Attorney Allen to withdraw would delay the commitment hearing, thereby prejudicing the government and its witnesses and impacting the court's docket. Weighing this factor, therefore, also supports the court's ruling.

proceedings. Id. at 467. Moreover, we recognized that the defendant did not "identify – let alone show – any specific way in which his defense was hampered by any lack of communication with his counsel." Id.

Here, the record reflects that Attorney Allen fully represented Blackledge at the commitment hearing. She filed a pre-trial brief, cross-examined the expert witnesses, moved for judgment as a matter of law, conferred with Blackledge about whether he wished to testify or present evidence, and made a closing argument. Although the majority concludes that the alleged communication breakdown prevented Blackledge from preparing for the commitment hearing or discussing whether he would testify, those general assertions – even if true - simply do not establish that the hearing was unfairly tainted by the attorney-client relationship.

Notably, Blackledge has not offered any reason why he could not have testified or, more importantly, what relevant testimony or other evidence he would have presented had his relationship with Attorney Allen been better. Importantly, Blackledge stipulated to the first two elements of the civil commitment analysis, so there was no relevant evidence he could have offered on those elements. As the district judge correctly observed, the issue of civil commitment boiled down to one question: whether the government proved the "serious difficulty"

59

element. Consistent with what Attorney Allen and Blackledge have repeatedly asserted, our caselaw establishes that resolution of this element depended on <u>expert</u> testimony, not on Blackledge's testimony.[13] Perhaps the most telling observation concerning the irrelevance of any testimony he may have offered comes from Blackledge: "[I]t seems highly probable that had he testified, his testimony would have failed to persuade the district court judge that he could refrain from further acts of sexual violence or child molestation." <u>Opening Brief of Appellant</u>, at 34.

In any event, regardless of whether they communicated before the hearing, and regardless of whether any of his testimony would be relevant, Attorney Allen had the opportunity to confer with Blackledge about testifying during the hearing, and he chose not to testify. Further, the district court reviewed Blackledge's deposition testimony during his deliberations and was aware of the substance of what he would likely say at the hearing. Moreover, the district judge noted, and Blackledge does not dispute, that Blackledge was prepared by

---

[13] The majority analogizes a commitment hearing to a sentencing hearing, observing that it often "turn[s] on mitigating evidence as to the respondent's continued dangerousness." <u>Majority Op.</u>, at 20. This analogy fails, however, because it ignores the fact that <u>expert</u> testimony is the relevant evidence for the "serious difficulty" element. Moreover, unlike a sentencing hearing, where a plea in mitigation can sway a district court towards leniency, the court's duty to commit a defendant is mandatory if the government proves the elements by clear and convincing evidence.

counsel before the deposition and represented by counsel during the deposition.[14]

E.

Apart from my disagreement with the majority's abuse-of-discretion and harmless error determinations, I also question its instruction on remand for the district court to "reconsider"

---

[14] The majority asserts that the admission of Blackledge's deposition into evidence indicates that the district judge found Blackledge's testimony to be relevant as to the "serious difficulty" element. See Majority Op., at 22 n.6. The majority is incorrect for at least two reasons. First, we have a good indication that the district judge did not consider Blackledge's testimony to be relevant to the "serious difficulty" element because the judge correctly noted early in the commitment hearing that the outcome of the commitment hearing hinged on expert testimony. Because Blackledge did not object to the government's subsequent attempt to admit the deposition into evidence, the district judge had no reason at that time to address whether it was relevant to the "serious difficulty" element or to exclude it for any reason; in this posture, the admission of the deposition simply accords with our admonition that most evidence should be admitted in non-jury proceedings. See Multi-Med. Convalescent and Nurs. Ctr. of Towson v. N.L.R.B., 550 F.2d 974, 977-78 (4th Cir. 1977). Second, and more importantly, the deposition was in fact relevant, but just not as the majority contends. Specifically, both of the experts who testified at the hearing relied on the deposition in part to form their opinions regarding whether Blackledge meets the commitment criteria, and they utilized the deposition during their testimony to help explain their opinions. See J.A. 184, 186, 187, 195, 215-16. The admission of the deposition was thus entirely consistent with the well-settled principle that the "serious difficulty" element "turns on the significance of the factual information as viewed by the expert psychiatrists and psychologists." Francis, 686 F.3d at 275. Regardless, it bears repeating that to whatever extent the district judge may have believed Blackledge's testimony was relevant, the judge had Blackledge's deposition testimony before him, and Blackledge has not explained what additional relevant testimony he would have given at the commitment hearing.

61

the withdrawal motions "after engaging in the appropriate inquiry regarding the extent of Attorney Allen's conflicts." Majority Op., at 24. I suspect that on remand the district court will ask the same question that I have: What is left to consider?

As I have noted, the majority has found that "Attorney Allen labored under a conflict of interest that caused her communications with Blackledge to be so broken that a 'fundamental step for adequate representation' – basic trial preparation – failed to occur," Majority Op., at 20, and that he was "forced to be represented by a lawyer asserting multiple conflicts of interest with whom he had not prepared for trial because of their inability to communicate," id. at 24. Given the definitive nature in which the majority has spoken, I fail to understand how the district court can "reconsider" these appellate findings or how it can do anything on remand other than appoint Blackledge new counsel and conduct another commitment hearing. I suspect that if the district court "reconsidered" the motions on remand and denied them, my colleagues in the majority – to be consistent with the majority opinion - will overturn the district court's decision if there is a subsequent appeal.

V

Based on the foregoing, I dissent. I would affirm the judgment of the district court.